## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In RE: | ) | **23-00217-ELG** |
| | ) | |
| CHARLES PAXTON PARET, | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| WENDALL W. WEBSTER, Chapter 7 | ) | |
| Trustee for Charles Paret, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DANIEL HUERTAS, ET AL., | ) | **Adv. Proc 23-10025-ELG** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF TRUSTEE'S MOTION FOR SUMMARY
JUDGMENT ON COUNT I OF THE THIRD AMENDED COMPLAINT**

1

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

    A.    Summary of Argument ........................................................................... 1

    B.    Summary Judgment Standard ............................................................... 4

    C.    Applicable Partnership Law .................................................................. 5

II.   ARGUMENT ..................................................................................................... 6

    A.    Huertas and Paret's Agreement to Share Profits Gives Rise to a Statutory Presumption of Partnership ........................................................................ 6

        1.    A Statutory Presumption of Partnership Arises From the Sharing of Profits ............................................................................................ 6

        2.    The Undisputed Fact is That Huertas and Paret Agreed to Share Profits from their Real Estate Portfolio ..................................... 7

    B.    Huertas and Paret Shared Profits, Liabilities and Management Decisions for the Real Estate Portfolio, and Huertas Held Out as Paret's Partner and Co-Owner, All of Which are Further Indicia under Beckman of a Partnership Between Huertas and Paret ....................................................................... 10

        1.    Courts Look to Various Indicia of Partnership (the Beckman Factors), Such as the Sharing of Liabilities, to Determine the Existence of a Partnership ....................................................... 10

        2.    The Beckman Factors in this Case Overwhelmingly Favor the Existence of a Partnership ........................................................... 11

    C.    DP Capital Functioned As the Entity Through Which Huertas held and exercised his ownership interest in the HP Partnership, and the Holbrook Holdings LLC Operating Agreement is Further Evidence of Partnership ............ 12

        1.    A Partnership and Limited Liability Companies can Co-Exist Under District of Columbia Law ....................................................... 13

        2.    DP Capital Functioned as the Designated Entity Through Which Huertas Held and Exercised His Ownership Interest in the HP Partnership ................................................................................ 14

        3.    The Amended Holbrook Holdings LLC Operating Agreement is Further Evidence of the HP Partnership ................................... 17

III.  CONCLUSION ................................................................................................ 21

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................................4

*Beckman v. Farmer*,
   579 A.2d 618 (D.C. 1990) ...................................................................................... *passim*

*Cannon v. District of Columbia*,
   569 A.2d 595 (D.C. 1990) ..........................................................................................2

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................................4

*Czekalski v. Peters*,
   475 F.3d 360 (D.C. Cir. 2007).....................................................................................4

*Eung Kwon Kim v. DP Capital, LLC, et al*,
   Civil Action 23-1101 (TJK)..........................................................................................2

*Medalie v. Ferry*,
   30 F. Supp. 2d 48 (D.D.C. 1998)..............................................................................6, 9

*Moore v. Hartman*,
   571 F.3d 62 (D.C. Cir. 2009).......................................................................................4

*Mroz v. Hoaloha Na Eha, Inc.*,
   410 F. Supp. 2d 919 (D. Haw. 2005)..........................................................................14

*Osseiran v. Int'l Fin. Corp.*,
   889 F. Supp. 2d 30 (D.D.C. 2012)................................................................................4

*Queen v. Schultz*,
   747 F.3d 879 (D.C. Cir. 2014) ................................................................................ *passim*

*Shenandoah Assoc. L.P. v. Tirana*,
   182 F. Supp. 2d 14 (D.D.C. 2001)..............................................................................14

*Wright v. Herman*,
   230 F.R.D. 1 (D.D.C. 2005)...................................................................2, 13, 14, 17

**Statutes**

D.C. Code

§ 29-602.02 ................................................................................................. *passim*
§ 29-602.02(a) ............................................................................................. *passim*
§ 29-602.02(c)(3) .................................................................................................6
§ 29-604.07 ..........................................................................................................6
§ 29-608.01 ..........................................................................................................6
§ 202 ..............................................................................................................6, 9

Haw. Rev. Stat. § 425-109 (2014) .............................................................................14

Va. Code. Ann.
§ 50-73.73 ..........................................................................................................14
§ 50-73.88 ..........................................................................................................14

**Other Authorities**

D.D.C. Local Civ. R. 7(h)(1) ....................................................................................5

Fed. R. Civ. P. § 56(a) ...........................................................................................4

Comes now the Trustee of the Debtor's estate, by undersigned counsel, and respectfully moves this Court for summary judgment on Count I of the Third Amended Complaint. Count I seeks a judgment declaring the existence of the Huertas-Paret Partnership (the "HP Partnership") between Debtor Charles Paxton Paret ("Debtor" or "Paret"), Daniel Huertas ("Huertas"), and DP Capital, LLC ("DP Capital"), which exists as a matter of law. This issue, once resolved, will allow the case to proceed efficiently toward a statutorily required accounting and dissolution of partnership assets. This motion turns on the legal effect of written agreements and transactional documents whose authenticity is not disputed. The Trustee submits the accompanying Statement of Material Facts and supporting exhibits.[1] For the reasons provided below, the Court should grant the Trustee judgment on Count I of the Third Amended Complaint.

## I.   INTRODUCTION

### A.   SUMMARY OF ARGUMENT

District of Columbia law does not require magic words, formal labels, or a standalone "partnership agreement" to create a partnership. Under the District of Columbia Uniform Partnership Act, a partnership arises when parties associate as co-owners of a business for profit, whether or not they subjectively intended the legal consequences of that relationship. D.C. Code § 29-602.02(a). There are two binding and seminal cases in the District of Columbia regarding the standards for determining whether a partnership exists, *Queen v. Schultz*, 747 F.3d 879 (D.C. Cir. 2014), and *Beckman v. Farmer*, 579 A.2d 618 (D.C. 1990). In both cases, the appellate courts reversed the trial court's summary judgment determination as to the existence of a partnership. Both cases undisputedly involve far less compelling facts regarding the existence of a partnership than those at issue here – where Huertas and Paret agreed to share all profits, losses, and

---

[1] Hereinafter ("SOF ¶ ___").

1

management decisions regarding a portfolio of properties with Huertas retaining ultimate decision-making authority. And, although not binding on this Court, there is one decision from *this district* directly addressing whether a partnership and limited liability company can co-exist. In *Wright v. Herman*, 230 F.R.D. 1 (D.D.C. 2005), the court conclusively determined that a partnership can exist notwithstanding the existence of a limited liability company formed by one of the parties as a "vehicle" to carry out the parties' business. The undisputed writings in this case satisfy the factors identified in *Beckman*.

More specifically, this Motion should be granted for the following reasons:

- First, at all relevant times, Huertas was the sole member and controlling principal of DP Capital and served as Chief Executive Officer of WCP Fund I, LLC ("WCP Fund I"),[2] the primary secured lender in the subject transactions. Paret and Huertas agreed to share all profits regarding a portfolio of properties (*i.e.*, the HP Partnership), giving rise to a statutory presumption of partnership under the District of Columbia Uniform Partnership Act and District of Columbia's partnership law.

- Second, Huertas and Paret agreed to share profits, losses, and management decisions, with Huertas maintaining ultimate decision-making authority, and Huertas called Paret his partner and co-owner, all of which are indicia of a partnership between Huertas and Paret under *Queen* and *Beckman*; and

- Third, as articulated in *Wright*, a partnership and limited liability companies – in this case, DP Capital – can co-exist as a matter of law, particularly where DP Capital shared in the profits, revenue, and any sale proceeds of the portfolio of properties

---

[2] "Proceedings in related cases may be judicially noticed." *Cannon v. District of Columbia*, 569 A.2d 595, 597 n. 3 (D.C. 1990) (citation omitted). A true and correct copy of Judge Timothy Kelly's Memorandum and Order in *Eung Kwon Kim v. DP Capital, LLC, et al*, Civil Action 23-1101 (TJK), in which the court determined that Daniel Huertas is the sole member of DPC and WCP, is attached as Exhibit 1. *See* Ex. 1 at 2 n. 1.

and also functioned as the entity through which Huertas exercised his ownership rights in HP Partnership assets.

In the property portfolio financing at issue here, WCP Fund I issued first-position deeds of trust while DP Capital, also wholly controlled by Huertas, held subordinate lien positions and the simultaneous rights to receive fifty percent of gross revenues and fifty percent of gross sale proceeds from the same properties, which rights expressly survived Paret's repayment of loan principal and interest. Through this carefully negotiated and coordinated structure, Huertas simultaneously occupied the positions of senior secured lender (through WCP Fund I), subordinate lienholder and revenue participant (through DP Capital), and profit-sharing participant along with Paret pursuant to an indisputable record trail. Huertas' layering of affiliated entities under common control, coupled with DP Capital's perpetual revenue participation and formalized 51/49 ownership, demonstrates objective manifestations of co-ownership of a real estate enterprise for profit within the meaning of D.C. Code § 29-602.02(a).

As discussed *infra*, on September 20, 2019, Huertas proposed in writing that he and Paret operate as a "partnership," allocating 51/49 decision-making authority and a 50/50 profit split. Paret responded in writing: "Agree." Contemporaneous text messages confirmed equal profit participation and continuing governance structure. On September 30, 2019, Huertas referred to his advances as "loan[s] to the partnership." A subsequent November 2019 Commercial Deed of Trust Note granted DP Capital a continuing right to fifty percent of gross revenues and fifty percent of gross sale proceeds from a defined property portfolio, with those rights expressly surviving repayment. In April 2020, the Holbrook Operating Agreement formalized a 51/49 ownership allocation and managerial authority consistent with Paret and Huertas' September writings. The undisputed documentary evidence in this matter objectively demonstrates shared control, capital

3

contributions, profit participation, and mutual financial risk. Taken together, these records satisfy the *Beckman* factors, discussed *infra*, and meet the objective intent standard set forth for establishing a partnership.

The undisputed material facts establish the existence of a partnership between the Debtor, Huertas, and DP Capital as a matter of law, and this Court should therefore grant summary judgment on this issue.

### B.    SUMMARY JUDGMENT STANDARD

Courts must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the burden of demonstrating the absence of a genuine issue of material facts. *Celotex*, 477 U.S. at 323. A genuine issue is one that might affect the outcome under governing law. *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the Court must draw all "justifiable inferences" in favor of the nonmoving party, *Liberty Lobby*, 477 U.S. at 255, and "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). "The nonmoving party cannot defeat summary judgment by 'simply show[ing] that there is some metaphysical doubt as to the material facts.'" *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The nonmoving party must demonstrate that there is sufficient evidence requiring the claimed factual dispute to be resolved by a jury or judge at trial." *Osseiran v. Int'l Fin. Corp.*, 889 F. Supp. 2d 30, 34 (D.D.C. 2012). "In determining a motion for summary judgment, the Court may assume that the facts identified by the moving party in its statement of

material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." D.D.C. Local Civ. R. 7(h)(1).

### C.   APPLICABLE PARTNERSHIP LAW

Under the District of Columbia Uniform Partnership Act, the existence of a partnership is determined by objective conduct, not labels or self-serving characterizations. A partnership is formed whenever two or more persons associate to continue as co-owners of a business for profit, "whether or not the persons intend to form a partnership." D.C. Code § 29-602.02(a). The inquiry turns on the parties' acts, their shared economic stake, the allocation of profits and losses, and the extent of joint control, not on subsequent assertions as to whether a partnership was intended.

The seminal case on the law of partnership in the District of Columbia is *Beckman v. Farmer*. *See Queen*, 747 F.3d at 886 (relying extensively on *Beckman*). While summary judgment as to the existence of a partnership was denied, both cases undisputedly involve far less compelling facts regarding the existence of a partnership than those at issue here where Huertas and Paret agreed to share all profits and management decisions regarding a portfolio of properties with Huertas retaining ultimate decision-making authority. In *Beckman*, the District of Columbia Court of Appeals held that a partnership may arise by implication and that courts must examine the agreement, the parties' conduct, and the surrounding circumstances, with emphasis on objective indicia such as profit sharing, joint control, and coordinated pursuit of a common enterprise. 579 A.2d 618, 625–29 (D.C. 1990). *Beckman* identifies the key guideposts: sharing of profits, sharing of losses, joint control, mutual agency, and coordinated pursuit of a common enterprise. *Id.* at 628-629. These are the so-called non-exclusive *Beckman* factors.

As the D.C. Circuit explained in *Queen*, a partnership may be established based on the parties' objective conduct, even in the absence of a formal written agreement, express partnership terminology, or mutual acknowledgment of partnership status where the evidence, as here, reflects

shared economic risk, coordinated efforts, and joint participation in a business for profit. 747 F.3d at 886–87 (D.C. Cir. 2014). Further, once formed, a partnership under D.C. Code § 29-608.01 continues until dissolution, and partners owe fiduciary duties until winding up (D.C. Code § 29-604.07).

## II.   ARGUMENT

### A.   HUERTAS AND PARET'S AGREEMENT TO SHARE PROFITS GIVES RISE TO A STATUTORY PRESUMPTION OF PARTNERSHIP

#### 1.   A Statutory Presumption of Partnership Arises from the Sharing of Profits

Under District of Columbia law, a statutory presumption of partnership arises from the sharing of profits. Section 202 of the Uniform Partnership Act, adopted in the District of Columbia as section 29-602.02 of the D.C. Code, gives rise to a presumption of partnership as follows. Subsection (a) provides, "Except as otherwise provided in subsection (b) of this section, the association of 2 or more persons to carry on as co-owners of a business for profit shall form a partnership, whether or not the persons intend to form a partnership." D.C. Code § 29-602.02(a) (2011). "Subsection (c) provides three rules of construction that apply in determining whether a partnership has been formed under subsection (a)." Uniform Partnership Act § 202 cmt. 3 (1997). "In determining whether a partnership is formed, the following rules shall apply: . . . (3) "A person that receives a share of the profits of a business shall be presumed to be a partner in the business . . .." D.C. Code § 29-602.02(c)(3). Together, these two subsections give rise to the rebuttable statutory presumption of a partnership when the partners share the profits of the business. Uniform Partnership Act § 202 (1997), cmt. 3 (sharing of profits creates a rebuttable presumption of partnership); *Queen*, 747 F.3d at 887 (D.C. Code "establishes a 'statutory presumption of partnership from the evidence that a party shared in the profits of the business.'") (quoting *Beckman*, 579 A.2d at 627); *Medalie v. Ferry*, 30 F. Supp. 2d 48, 50 (D.D.C. 1998) ("[T]he very

6

essence of a partnership is the sharing of profits and losses, and the Uniform Partnership Act codifies this principle.").

### 2. The Undisputed Fact is That Huertas and Paret Agreed to Share Profits from their Real Estate Portfolio

Huertas and Paret agreed to share profits. SOF ¶¶ 8-10. As evidenced by their discussions, Huertas and Paret entered into a partnership agreement regarding a real estate portfolio in which the profits would be shared equally. SOF ¶ 8. While ultimate decision-making authority would rest with Huertas, "*[p]rofit remains 50/50.*" SOF ¶ 10; Ex. 5 at 4 (emphasis added).

The partnership discussions between Huertas and Paret began in September 2019 and were effectuated through written communications and agreements exchanged between September 20, 2019, and November 6, 2019. SOF ¶¶ 3-7. On Friday, September 20, 2019, at 2:10 p.m., Paret emailed Huertas a list of payments totaling $150,000 that needed to be paid "ASAP." SOF ¶ 3; Ex. 2 at 2. Attached to this email was an Excel spreadsheet with the file name "Copy of Coloma River Assets Debt Construction ARV_FULL Project_Pipeline_DANIEL.xlsx." SOF ¶ 3; Ex. 2 at 4. The spreadsheet identified and described in detail 28 properties, their total debt, unit count, after renovated value ("ARV") and corresponding notes for each property. SOF ¶ 3; Ex. 2 at 4. The total purchase price for all of the properties was $49,327,645.63; the total construction costs were $70,470,000.00; the total ARV was $215,800,000.00; and the total "GP Value/Equity Value" was $96,002,354.37. SOF ¶ 3; Ex. 2 at 4.

On September 20, 2019, at 2:54 p.m., Huertas emailed Paret, stating "Received," and went on to state:

> Here is further confirmation that by providing the below capital including future capital *to the partnership*, this is debt that will be split 51% Daniel Huertas, 49% Charles Paret. Charles Paret will manage the day-to-day operation of all projects (construction, development, stabilization) including in this email. Daniel Huertas will manage all financial aspects related to capital, partnerships,

> ventures and will have final word related to execution of the real
> estate.   Charles Paret is responsible solely for all debt and
> obligations prior to 9/20/19. (payments) . . . Please return with Agree
> and confirm that we will operate as such.

SOF ¶ 3; Ex. 2 at 1 (emphasis added). In a 3:14 p.m. email, Paret responded: "Only thing here is

the 50/50% on profit split.   51% executive decision on executing the sale, right? . . . But overall

agree with everything." SOF ¶ 6; Ex. 3 at 1-2. At 3:22 p.m., Huertas responded: "***Profit 50/50***

***correct*** and agree with everything else in this email." SOF ¶ 6; Ex. 4 at 1 (emphasis added). At

3:49 p.m., Paret responded stating "Agree." SOF ¶ 6; Ex. 3 at 1.

The parties also confirmed the partnership's essential economic and governance terms

through a text message exchange on the same day. Paret stated that the proposed structure was

"[o]verall … good," and confirming that profits were to be shared 50/50 once the properties were

performing. SOF ¶ 8; Ex. 5 at 3. Huertas agreed, confirming "[w]e will always be 51/49 decision

making. ***Profit remains 50/50.***" SOF ¶ 10; Ex. 5 at 4 (emphasis added).

These email and text exchanges demonstrate conclusively the formation of a partnership

between Huertas and Paret whereby ***profits would be shared equally***, debt would be split

51%/49%, Huertas would have responsibility for financial matters, and Paret would have

responsibility for construction and development of the properties.

On September 30, 2019, Huertas sent another email to Paret reiterating the existence of the

partnership and characterizing distributions of funds made by Huertas or his companies to the

partnership as loans. SOF ¶ 14; Ex. 6 at 2. In particular, Huertas wrote:

> Charlie –
>
> Please see attached payment requests. By Daniel Huertas and/or
> companies paying the attached invoices for properties, Daniel
> Huertas will have 50% ownership of the properties and 51% in
> regard to control. Any other partnership set by Charles Paret will be
> taking from his side. *The payments here are a loan to the partnership*

at 10% APR. Before any distribution is provided, *the partnership
needs to pay all amounts paid here.*
429 Kennedy Street (5068) - $4,030.16
433 Kennedy Street (5120) - $4,182.80
4910 Georgia Ave (#5607) $13,339.91

*Id.* (emphasis added).

By expressly linking his capital contributions to specific partnership assets, Huertas confirmed his understanding that the payments were partnership capital. Huertas' email also identified certain of the properties that were held by the partnership, including Holbrook, Bladensburg, P Street, I Street, and multiple Trinidad Avenue properties. SOF ¶ 4; Ex. 2 at 4. Huertas and Paret agreed that Huertas would control disbursement of funds for property purchases and development expenses, ensuring that he retained leverage over the financial side of their partnership, and controlled the loan transactions simultaneously as partner and lender.

Given Huertas and Paret's agreement to share profits, the Court should grant summary judgment as to the existence of their partnership. Uniform Partnership Act § 202 (1997), cmt. 3 (sharing of profits creates a rebuttable presumption of partnership); *Queen*, 747 F.3d at 887 (D.C. Code "establishes a 'statutory presumption of partnership from the evidence that a party shared in the profits of the business.'") (quoting *Beckman*, 579 A.2d at 627); *Medalie v. Ferry*, 30 F. Supp. 2d 48, 50 (D.D.C. 1998) ("[T]he very essence of a partnership is the sharing of profits and losses and the Uniform Partnership Act codifies this principle.").

Huertas never issued a notice of dissolution, never wound-up partnership affairs, and never provided partnership accounting. Rather than stopping, he maintained the same control rights he asserted as a partner from September 2019 through April 2020, utilizing DP Capital and WCP Fund I, both of which he fully controlled, to then foreclose on and wrongfully take possession of HP

9

Partnership assets. The HP Partnership, coupled with the absence of dissolution, confirms the partnership remains in existence, and an accounting to the Debtor's estate must be made.

**B.    HUERTAS AND PARET SHARED PROFITS, LIABILITIES AND MANAGEMENT DECISIONS FOR THE REAL ESTATE PORTFOLIO, AND HUERTAS HELD OUT AS PARET'S PARTNER AND CO-OWNER, ALL OF WHICH ARE FURTHER INDICIA UNDER *BECKMAN* OF A PARTNERSHIP BETWEEN HUERTAS AND PARET**

    **1.    Courts Look to Various Indicia of Partnership (the *Beckman* Factors), Such as the Sharing of Liabilities, to Determine the Existence of a Partnership**

A partnership arises when "two or more persons … intend to associate together to carry on [a lawful business] as co-owners for profit." *Beckman*, 579 A.2d at 627. The Uniform Partnership Act, adopted in the District of Columbia, codifies the statement of partnership law in *Beckman*. D.C. Code § 29-602.02(a) provides, "[T]he association of 2 or more persons to carry on as co-owners of a business for profit shall form a partnership, whether or not the persons intend to form a partnership." The last phrase of the provision, "whether or not the persons intend to form a partnership," establishes that the test is an objective one, not determined by the subjective intent of the parties but rather by their conduct. The customary attributes of partnership include:

- **Profit sharing**. The court acknowledged the statutory presumption of partnership form evidence that a party shared in the profits of the business. *Id.* at 627.

- **Control**. "[R]ight of joint control is ordinarily key to partnership . . .." *Id.* at 628. Important factors in evaluating the control factor include a partner's right to "transact business on the firm's bank accounts on his own signature," joint lease obligations, and facts demonstrating the decisions were made only after "consultation." *Id.*

- **Loss Sharing**. "[A] partner must contribute toward the losses, whether of capital or otherwise . . . but again the parties may agree to the contrary . . .." *Id.* (internal citations and quotation marks omitted). "[L]oss sharing – like profit sharing and

10

control – takes on greater or lesser importance as an independent element of partnership depending on the extent to which there is evidence supporting partnership." *Id.* (internal citation and quotation marks omitted). What constitutes "loss sharing" takes many forms, including liability for lease obligations, responsibility for company loans, and potential liability "to third party creditors . . . because of the manner in which [a party] is held out" to the public. *Id.*

- **Self-characterization**. "[H]ow the parties held themselves out to the public is not without probative significance as the parties' intent as between themselves." *Id.* at 628 n. 11 (citing *Johnson v. Weinberg*, 434 A.2d 404, 407 (D.C. 1981)).

These are the so-called non-exclusive *Beckman* factors.

## 2. The *Beckman* Factors in this Case Overwhelmingly Favor the Existence of a Partnership

Huertas and Paret agreed to share profits. *See* discussion *supra* at Section II.A. Huertas repeatedly reaffirmed that he and Paret would share profit 50/50. SOF ¶ 10; Ex. 5 at 4. The profit-sharing facts in this case are stronger in favor of partnership than in *Beckman*.

There is an abundance of evidence demonstrating Huertas' control in the HP Partnership management decisions and the conduct of the HP Partnership business. *See, e.g.*, SOF ¶ 3; Ex. 2 at 1 ("Daniel Huertas will manage all financial aspects related to capital, partnership, ventures, and will have final word related to execution of the real estate."); SOF ¶ 13; Ex. 6 at 2 ("Daniel Huertas will have 50% ownership of the properties and 51% in regards of control."); SOF ¶ 10; Ex. 5 at 4 ("We will always be 51/49 decision making.").

The November 6, 2019, HUD-1 demonstrates the breadth of Huertas' control over HP Partnership assets. SOF ¶ 30; Ex. 9. In particular, the HUD-1 evidences a $1,800,000 loan and contains a Draw Summary distribution of $1,694,493.09 to WCP Fund I as well as a $36,000 Loan

Origination Fee to DP Capital. *Id.* The $1.8M loan funds were not meant for an independent borrower's use; rather, they were allocated within the integrated portfolio managed by Huertas. The interconnectedness of WCP Fund I and DP Capital is significant, as both were under Huertas' sole control, *see* SOF ¶ 1; Ex. 1 at 2 n. 1, and used interchangeably to execute the venture's objectives. *See also infra* Section II.C(3) (Huertas utilizing DP Capital and the Amended Holbrook Holdings LLC Agreement to exercise his ownership interests in HP Partnership assets).

There are numerous examples of Huertas agreeing to the sharing of liabilities of the HP Partnership business. As referenced *supra*, on September 20, 2019, at 2:54 p.m., Huertas emailed Paret, and stated that ". . . this debt that will be split 51% Daniel Huertas, 49% Charles Paret." SOF ¶ 3; Ex. 2 at 1; *see also* SOF ¶ 6; Ex. 3 at 3 (same); SOF ¶ 6; Ex. 4 at 3 (same).

Paret and Huertas also referred to themselves as partners. On October 31, 2019, at 1:17 p.m., Paret emailed Washington Capital Partners loan and title processing officer, Paul Flather, with the subject line "Update on Properties & ARV Values - LLCs confirmed." SOF ¶ 15; Ex. 7 at 4-9. In this email, Paret stated the amount that Huertas had advanced to date and provided a list of "the *properties we have agreed to for a 50 percent ownership stake*." SOF ¶ 15; Ex. 7 at 5 (emphasis added). In response, at 4:47 p.m., Huertas instructed Paret and Flather to "communicate and collect the LLC docs of the [listed] properties . . .." SOF ¶ 15; Ex. 7 at 3. At 4:50 p.m., Huertas formally requested the LLC ownership documents for the properties contributed by Paret. SOF ¶ 15; Ex. 7 at 1. This email exchange further demonstrates the existence of a partnership given Paret and Huertas' self-characterization as partners. Self-characterization is probative of the existence of a partnership. *Beckman*, 579 A.2d at 628.

**C.     DP CAPITAL FUNCTIONED AS THE ENTITY THROUGH WHICH HUERTAS HELD AND EXERCISED HIS OWNERSHIP INTEREST IN THE HP PARTNERSHIP, AND THE HOLBROOK HOLDINGS LLC OPERATING AGREEMENT IS FURTHER EVIDENCE OF PARTNERSHIP**

1. **A Partnership and Limited Liability Companies can Co-Exist Under District of Columbia Law**

As articulated in *Wright v. Herman* and other cases, a partnership can exist notwithstanding the existence of a limited liability company formed by one of the parties as a "vehicle" to carry out the parties' business. The court in *Wright* upheld plaintiff's claim of partnership between her and the defendants, who operated their business through the vehicle of a limited liability company. 230 F.R.D. at 10 (D.D.C. 2005). Plaintiff Wright and defendant Herman agreed to form a project management and real estate development firm to carry out business within the District of Columbia. *Id.* at 2-3. They transferred assets to an existing Virginia limited liability company that Herman had formed, and they established office headquarters in the District of Columbia. *Id.* at 3. Wright and Herman later brought on defendant May, who received an interest in the LLC. *Id.* After Herman and May allegedly conspired to exclude Wright from the profits and management of LLC, Wright brought suit for declaration of her rights as a partner, an accounting, and breach of a partner's fiduciary duty. *Id.* Wright alleged that she and Herman agreed to operate the business as partners even though they chose to use the existing limited liability company that Herman had formed as a "vehicle" to carry out their business. *Id.* at 3, 8.

The issue before the court in *Wright* was whether Wright could allege the concurrent existence of a partnership between her and defendants, notwithstanding the existence of the LLC as the "vehicle" for conducting the business and no written partnership agreement. *Id.* at 8. The court held that she could. *Id.* at 10. The court noted that other courts have recognized the co-existence of a partnership and the formal entities through which the partnership conducts its business:

> . . . [S]ome courts have enforced partnership rights and remedies among and against corporate shareholders who use the corporate form to achieve business enterprises but agree among themselves to act and be treated as partners internally. . . .

13

> Crucial to factual situations where courts have imposed partnership remedies on members of a corporate entity is (1) evidence of the actual intentions of the parties, . . . and (2) evidence of the factual operations of the partnership/corporate entity. Just as alleged 'partners' who actually operate as shareholders cannot disregard the corporate form they have chosen, *neither may corporate shareholders who in all other aspects actually operate as partners among themselves disregard the choice to so operate*.

*Id.* at 9-10 (internal citations omitted) (emphasis added). The ultimate question is whether the evidence shows that the parties agreed to and did operate "*inter sese* as partners." *Id.* at 9.[3] *See also*, *Mroz v. Hoaloha Na Eha, Inc.*, 410 F. Supp. 2d 919, 930-31 (D. Haw. 2005) (permitting a claim of partnership where the partners operated the business of the partnership through a number of business entities, including LLCs).[4]

### 2. DP Capital Functioned as the Designated Entity Through Which Huertas Held and Exercised His Ownership Interest in the HP Partnership

On November 5, 2019, Paret, on behalf of seventeen property-holding LLCs,[5] executed a Commercial Deed of Trust Note by which Huertas, through WCP Fund I, lent $1.8 million to such LLCs. SOF ¶ 19; Ex. 8 at 27. The Commercial Deed of Trust Note, however, does not read like a

---

[3] Although the court applied Virginia law to its analysis of the partnership issue, Virginia has adopted the Uniform Partnership Act, Va. Code. Ann. § 50-73.73 (2004), and the relevant statute under the Virginia Uniform Partnership Act is materially the same as the relevant statute under the District of Columbia Uniform Partnership Act. *Cf.* Va. Code. Ann. § 50-73.88 (2004) to D.C. Code § 29-602.02. *See also Shenandoah Assoc. L.P. v. Tirana*, 182 F. Supp. 2d 14, 19 (D.D.C. 2001) (recognizing that "the laws governing partnerships in the District of Columbia and Virginia are almost identical").

[4] Like the District of Columbia, Hawaii has adopted the Uniform Partnership Act. Haw. Rev. Stat. § 425-109 (2014) is identical in all material respects to the D.C. statute. *Cf.* Haw. Rev. Stat. § 425-109 (2014) ("parts") *to* D.C. Code § 29-602.02 (2014) ("chapters").

[5] 5412 1st Street NW, Washington DC 20011; 1236 Simms Place NE, Washington, DC 20002; 5419 1st Street NW, Washington DC, 20011; 1736 Montello Avenue NE, Washington, D.C. 20002; 1738 Montello Avenue NE, Washington, D.C. 20002; 205 W. Madison Street, Baltimore, MD 21201; 107 Rhode Island Avenue NW, Washington DC 20001; 1260 Holbrook Terrace NE, Washington, D.C.; 1249 Bladensburg Road NE, Washington, D.C. 20002; 1264 Holbrook Terrace NE, Washington, D.C. 20002; 1268 Holbrook Terrace NE, Washington, D.C. 20002; 1471 Gerard Street NW, Washington, D.C. 20009; 71 Kennedy St. NW, Washington, D.C. 20011; 429 Kennedy St. NW, Washington, D.C. 20011; 208 First Street, Berryville, VA 22611; 635 East Main Street, Berryville, VA 22611; and 431 Kennedy St. NW, Washington, D.C. 20011.

typical lending instrument. To the contrary, it further confirms the existence of the HP Partnership by providing that:

(i)     "[i]n addition to and separate from all other amounts due under this Note" (i) the LLC borrowers "shall pay to [WCP Fund I's] affiliate, DP Capital LLC, 50% of all gross revenue generated from the Property, and/or Supplemental Properties, and/or by Borrower".

(ii)    the LLC borrowers "*shall pay to [WCP Fund I's] affiliate DP Capital LLC*, 50% of the gross sales proceeds upon a bona fide arm's length sale of the Property or any or all of the Supplemental Properties by [the LLC borrowers] or any affiliate of [the LLC borrowers] to an unaffiliated 3rd party purchaser with a sales price of no less than the then fair market value of the Property";

(iii)   such terms "shall survive repayment of all principal and interest due under this Note, and shall survive any release, termination, and/or extinguishment of the Deed of Trust".

(iv)    "[i]f the Property … is subdivided into condominium units, this paragraph shall apply to each and every such condominium unit"; and

(v)     "[i]f the Deed of Trust is released, terminated, and/or extinguished, upon [WCP Fund I's] request to [the LLC borrowers], the Operating Agreements of [the LLC borrowers] shall be amended (1) to acknowledge and confirm the rights of [WCP Fund I's] affiliate DP Capital LLC as set forth in this paragraph, and (2) to provide that [the LLC borrowers] shall not lease, convey, or encumber the Property or Supplemental Properties without [WCP Fund I's] express written permission."

*See* SOF ¶¶ 20-28; Ex. 8 at 2-3, 27 (emphasis added).

15

In other words, even if the borrower LLCs prepaid the loan in full, consistent with the parties' intended partnership, DP Capital retained a perpetual right to half of all gross revenues and gross sale proceeds from the subject properties – *i.e.*, a fixed equity stake in these properties at every stage of their life cycle, from development to ultimate sale.

This Commercial Deed of Trust Note is clear on its face and fully consistent with Paret and Huertas' September partnership formation writings. It did not replace the partnership agreement; it implemented and formalized it. While WCP Fund I is identified as the Lender for purposes of principal repayment, the Commercial Deed of Trust Note separately and distinctly grants DP Capital an irrevocable right to fifty percent (50%) of all gross revenues generated from the Property and Supplemental Properties and fifty percent (50%) of all gross sale proceeds upon disposition of those properties. These rights, which are clearly stated as being "in addition to and separate from all other amounts due under this Note," remain in effect even after all principal and interest have been paid off, continue beyond the release or termination of the Deed of Trust, and can only be canceled with explicit written confirmation.

DP Capital receives significant benefits and is eligible for fifty percent of all operating revenue and half of the business's realized value when sold, based on gross figures rather than net. These rights apply across portfolios, include condominium subdivisions, bind future affiliated owners, and are supported by required amendments to borrower LLC agreements and transfer restrictions without consent. DP Capital can also enforce its rights through declaratory relief and *lis pendens*. Moreover, its economic rights are not extinguished when the loan is paid; it remains embedded in the enterprise itself.

DP Capital's role was not merely theoretical. According to this instrument, it received distributions, exercised consent rights over transactions affecting the properties, directed or

required amendments to operating agreements consistent with its participation rights, enforced its rights when necessary, and intervened in transactions to protect its economic position. Such conduct is consistent with co-ownership participation and inconsistent with passive creditor status. A lender's role is repayment; DP Capital's conduct reflects controlled governance and self-insured economic participation in the venture. Instructively, the Note's structure exceeds what is typically described as participating debt which is usually tethered to outstanding principal and extinguished upon repayment. Here, DP Capital's economic participation is not compensation for loan risk; it is a durable, enforceable share of enterprise value.

The undisputed wording of the November Commercial Deed of Trust Note, coupled with DP Capital's actual exercise of participation and consent rights, establish shared profits, allocated control, coordinated capital deployment across a defined portfolio, and continuing economic participation that survives repayment and binds subsequent ownership structures. When read together with the September writings and the parties' conduct, the Commercial Deed of Trust Note confirms the existence of the HP Partnership between Paret and Huertas, with DP Capital functioning as the designated entity through which Huertas held and exercised his ownership interest. *See Wright*, 230 F.R.D. at 9-10 (Parties who "in all other aspects actually operate as partners among themselves [cannot] disregard the choice to so operate.").

### 3. The Amended Holbrook Holdings LLC Operating Agreement is Further Evidence of the HP Partnership

The Holbrook Holdings LLC Amended and Restated Operating Agreement from April 8, 2020 (the "Holbrook OA"), identifies both Huertas and Paret as LLC "Members," and allocates 51 percent to Huertas and 49 percent to Paret. SOF ¶¶ 31-33; Ex. 10 at 2, 4. Moreover, Section 2.3 of the Holbrook OA names Huertas as the sole Manager of Holbrook Holdings LLC, with full authority, "acting alone," to "control and manage the Company and the Property." SOF ¶ 33; Ex.

10 at 4. The section goes on to explicitly state, without limitation of the foregoing, that "Huertas, acting alone, shall be authorized to cause the Company to encumber the Property and/or to sell the Property – all in Huertas's sole and absolute discretion." *Id*.

The Holbrook OA further provides that until Paret pays a $375,000.00 reimbursement, he "shall not be entitled to any disbursements, payments, reimbursements, etc. of any kind whatsoever" from the LLC, and that any disbursements would be "irrevocably the property of Huertas." *Id*. Ex. 10 at 2-3. This language speaks to $375,000.00 repayment proceeds going directly to *Huertas*, not WCP Fund I, again demonstrating evidence of the HP Partnership.

When examined alongside the Holbrook OA, the April 10, 2020, HUD-1 for 1260 Holbrook LLC provides concrete evidence of how the enterprise functioned in practice and how financial benefits flowed within it. SOF ¶¶ 34-37; Ex. 11. Congressional Bank served as the refinancing lender; 1260 Holbrook LLC was the borrower. *Id.* The HUD-1 reflects that $1,567,875 of the $1,800,000 of the refinance proceeds was used to satisfy two existing WCP Fund I liens in the amounts of $1,419,875 and $148,000. Thus, most of the refinancing proceeds were directed to an entity controlled by Huertas.

The refinancing cannot be viewed in isolation from the Subordination Agreement executed in connection with it. SOF ¶¶ 36-37; Ex. 12. Under the Subordination Agreement, Washington Capital Partners, LLC voluntarily subordinated its lien position to facilitate the Congressional Bank loan. Subordination is a material act; it alters priority and exposes the subordinating creditor to risk. Yet immediately upon completion of the refinance, the same Washington Capital Partners liens were paid in full from the refinancing proceeds. At the time of these transactions, Huertas simultaneously served as (i) sole Manager of Holbrook, with unilateral authority to authorize refinancing and encumbrance of the property, and (ii) principal of Washington Capital Partners,

18

LLC, the entity whose liens were subordinated and then satisfied. He approved the refinance on behalf of the borrower, approved the subordination on behalf of the existing lienholder, and ultimately received the payoff through the affiliated entity he controlled.

This coordinated sequence mirrors the economic structure embedded in the Commercial Deed of Trust Note. As discussed *supra*-Section II.C(2), the Commercial Deed of Trust Note granted DP Capital a continuing fifty-percent participation in gross revenues and sale proceeds that survives repayment and binds the enterprise itself. The refinancing and subordination effort reflect the same integrated reality: capital was managed within a unified structure under Huertas' centralized authority. A lender whose sole interest is repayment does not ordinarily subordinate, refinance, and receive payoff within a framework of common control absent arm's-length negotiation. Here, the transactions occurred inside a structure in which the same individual controlled the borrower entity, the subordinating lienholder, and the economic participation vehicle holding a perpetual fifty-percent stake in enterprise value.

The result is not merely evidence of financial movement; it is evidence of coordinated control over partnership property. The refinancing demonstrates that the lending instruments functioned within a co-ownership framework rather than as detached commercial loans between independent actors. That unified authority and integrated capital management are consistent with partnership-level control and materially inconsistent with the theory that WCP Fund I and DP Capital operated as independent, arm's-length creditors.

The Holbrook OA reflects the formal agreement reached months earlier, specifically the email exchanges between Huertas and Paret from September–October 2019. In those communications, they established a 51/49 control structure, an equal 50/50 profit split, classified Huertas' advances as "loans to the partnership," and agreed to share risks collaboratively within

their defined partnership portfolio. *See, e.g.*, SOF ¶¶ 3-14; Exs. 2-6. Viewed in their totality, the aforementioned documents reveal a coherent, clear, and indisputable legal picture. The September emails and text messages show the creation of the HP Partnership. The Holbrook OA shows formal joint ownership and grants Huertas full managerial control of HP Partnership assets. SOF ¶ 32; Ex. 10 at 2. The April 10, 2020, HUD-1 for 1260 Holbrook LLC shows Huertas using partnership property to pay himself through his own Washington Capital Partners, LLC. SOF ¶ 35; Ex. 11. The Subordination Agreement shows coordinated control by the same individual on both sides of the transaction. SOF ¶ 36; Ex. 12. A lender cannot do these things. A partner can.

In sum, the refinancing and subordination transactions demonstrate exposure to downside risk. In connection with the Congressional Bank refinancing, Washington Capital Partners, LLC voluntarily subordinated its lien position, thereby altering priority and assuming the risk of nonpayment in favor of a third-party lender. SOF ¶¶ 36–37; Ex. 12. Subordination is not a neutral act; it is a reallocation of risk. That risk was assumed within a structure where Huertas simultaneously controlled the borrower entity, the subordinating lienholder, and the entity holding revenue participation rights. Huertas determined the capital flow inside a unified enterprise framework, not separately nor at arm's length between independent actors. The Holbrook OA's reimbursement and distribution provisions further reflect internal capital adjustment mechanisms typical of partners rather than creditors. Distributions were limited and reassigned internally until capital reimbursements were fulfilled. SOF ¶¶ 31-33; Ex. 10 at 2–3. Such provisions reflect internal balancing of capital accounts, not third-party repayment terms. Overall, these characteristics show that Huertas' financial status was closely linked to the business itself.   His return depended on property performance, market value, refinancing success, and coordinated management decisions. His capital and participation rights continued

for the duration of the assets, even after the loan was repaid. This alignment of governance authority, profit participation, and exposure to enterprise performance satisfies *Beckman*'s loss-sharing factor. Even with adverse inferences, the material facts here demonstrate that Huertas functioned as borrower, lender, and partner. Against this backdrop, the Holbrook OA and the HUD-1 transaction are powerful, transaction-level proof that Holbrook was partnership property and that Paret and Huertas' relationship was a partnership as a matter of law.

### III.   CONCLUSION

The record set forth by the Trustee is not ambiguous. The partnership between Huertas and DP Capital, on the one hand, and Charles Paret on the other was irrefutably and explicitly acknowledged, performed, and memorialized through emails, transactional documents, and operational agreements. Huertas indisputably wore two hats at the same time – lender and partner. He wielded control, shared profits, and exercised governance over partnership assets, both directly and through DP Capital. Under D.C. Code § 29-602.02(a) and the controlling precedent in *Beckman* and *Queen*, the legal standard is settled: where parties act as co-owners of a business for profit, a partnership exists, whether or not they intended it, and regardless of how they later describe it. There is no hiding place here. The evidence confirms a partnership. The profit and loss sharing, control, and self-characterization present throughout the record overwhelmingly demonstrate the existence of the HP Partnership.

For the foregoing reasons, the Court should grant Trustee's motion for summary judgment on Count I and therewith proceed to ascertain the partnership corpus, and its immediate implications on the pending bankruptcy.

Dated: February 28, 2026

**TEMPLE LAW OFFICES**

*/s/ Donald M. Temple*
Donald M. Temple #408749
2522-B Virginia Avenue, N.W.
Washington, DC 20037
Tel: (202) 628-1101
dtemplelaw@gmail.com

**BLANK ROME LLP**

*/s/Lisa M. Coyle*
Lisa M. Coyle
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 885-5592
lisa.coyle@blankrome.com
(Pro Hac Vice Motion Forthcoming)

*Counsel of Record for Wendall W. Webster,*
*Chapter 7 Trustee for Charles Paxton Paret*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2026, a copy of this filing was delivered via ECF on

the following:

> Maurice B. VerStandig, Esq.
> Bar No. MD18071
> The VerStandig Law Firm, LLC
> 1452 W. Horizon Ridge Pkwy, #665
> Henderson, Nevada 89012
> Phone: (301) 444-4600
> mac@mbvesq.com
>
> *Co-Counsel for*
> *Defendants*

*/s/ Donald Temple*
Donald Temple