# Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EUNG KWON KIM et al.,

        *Plaintiffs*,

    v.

DP CAPITAL LLC et al.,

        *Defendants*.

Civil Action No. 23-1101 (TJK)

## <u>MEMORANDUM OPINION & ORDER</u>

Eung Kwon Kim and his company, Kim Georgia Ave, LLC, allege that Defendants exe-cuted a fraudulent scheme to scam them out of $600,000.  Specifically, Plaintiffs say that when they bought three new (pre-construction) condominium units for "half price" in 2020, Defendants did not record the purchase.  Instead, with help from an escrow agent that released Plaintiffs' purchase funds without permission, some Defendants took Plaintiffs' money to cover closing costs on a financing deal with other Defendants.  The alleged fraudsters then gave their entities priority over Plaintiffs' interest in the condominiums, including by issuing backdated deeds of trust.  And when the property went through a foreclosure sale two years later, an affiliate of some Defendants purchased the property at a major discount.  Seeking redress for the injuries resulting from this alleged plot, Plaintiffs sued, asserting District of Columbia statutory and common-law claims.  Some Defendants now move to dismiss.  The Court will deny one motion, and grant in part and deny in part the other.

## I.    Background

According to the Amended Complaint, the heart of this dispute is Plaintiffs' purchase of three condominium units within a proposed residential development at 4910 Georgia Avenue, NW

in Washington, DC ("the Property").   Plaintiffs allege that "through a *de facto* partnership," Charles Paret and Daniel Huertas developed that property, with each controlling (or sharing control of) several entities involved in the development and relevant transactions.   ECF No. 36 ("Am. Compl.") ¶¶ 19–20.   Taking Plaintiffs' lead, the Court refers to Paret and his entities as the "Developers," and to Huertas's entities as the "WCP Entities" or "WCP."   *See id.* ¶¶ 6, 21.[1]

Plaintiffs allege that as of late 2018, 4910 Georgia Ave Holdings, LLC held title to the Property.   Am. Compl. ¶¶ 22, 24.   Huertas became involved about a year later.   One of his entities, WCP Fund I, recorded an "Assignment of Deed of Trust" in the Property in August 2019.   *Id.* ¶ 25. Soon after, Huertas confirmed to Paret that he would handle the financial aspects of the development while Paret would manage the day-to-day operations.   *Id.* ¶¶ 26–28.

In June 2020, 4910 Georgia Ave Holdings, LLC began seeking purchasers for new (pre-construction) condominium units at the Property.   Am. Compl. ¶ 32.   A month later, Kim was "virtually introduced" to the Developers.   *Id.* ¶ 35.   Kim met Paret and another member of 4910 Georgia Ave Holdings, LLC in person days later, and they offered him the "opportunity" to buy three condominium units at the Property for $600,000—purportedly "half price."   *Id.* ¶¶ 39–40. Kim was also told that his payment funds would "not be released until certain construction benchmarks were met."   *Id.* ¶ 41.   Paret also represented that "any loan affecting the title or status of the deed" would be "paid off" before closing.   *Id.* ¶ 44.

Closing was set for July 31, 2020.   Am. Compl. ¶ 48.   As of that date, no WCP Entity held a mortgage or other loan encumbrance against the Property.   *Id.* ¶ 46.   Kim borrowed $600,000 to

---

[1] Paret is the sole member of Coloma River Holdings, LLC and shares control of 4910 Georgia Ave Holdings, LLC.   *See* Am. Compl. ¶¶ 9–10, 21.   Huertas is the sole member of DP Capital LLC and WCP Fund I, LLC.   *See id.* ¶¶ 3–4.   And although Victoria Junkins is the sole member of WCP 4910 Georgia Ave NW LLC, *see id.* ¶ 5, Plaintiffs allege that Huertas controls that entity too, *see id.* ¶ 23.

have the funds ready, and by the closing date he had wired those funds "to District Title"—the Developers' designated title company—"to be held in escrow." *Id.* ¶¶ 42, 47, 49. At closing, Paret—purportedly acting on behalf of the seller, 4910 Georgia Ave Holdings, LLC—"presented Dr. Kim with the sale agreement" and "confirmed receipt of the funds in full." *Id.* ¶¶ 49–50. The agreement states that 4910 Georgia Ave Holdings, LLC will convey "good and marketable title to the Property by general warranty deed." ECF No. 36-1 at 75. The Developers also allegedly represented that they would not transfer or dispose of any part of or interest in the Property without Plaintiffs' consent. Am. Compl. ¶ 53.[2]

After the parties signed the agreement, Plaintiffs allege that Paret told Kim that "he was heading directly to the Office of the Recorder of Deeds for the District of Columbia to record Plaintiffs' ownership." Am. Compl. ¶ 61. He never did.[3] *Id.* ¶ 62. All Defendants allegedly knew that Plaintiffs had bought the condominium units and that the Developers could not convey Plaintiffs' interest without permission. *Id.* ¶ 66. Still, the Developers and District Title took several steps after failing to record Plaintiffs' ownership to jeopardize Plaintiffs' interest by using their payment as financing for the Property. *Id.* ¶¶ 65–69. Specifically, they wrongly disbursed the funds Plaintiffs had paid to District Title, combined those funds with another purchaser's funds, and used that cash for closing costs necessary to obtain financing from WCP Fund I. *Id.* ¶ 69.

Plaintiffs say that days after their purchase, the WCP Entities had their lawyer prepare documents to convey the Property's commercial aspects from 4910 Georgia Ave Holdings, LLC

---

[2] The only remaining defect in title was a loan recorded against the Property from Cornerstone Capital LLC. A certificate of satisfaction for the loan was filed on August 5, 2020, and the defect was cured a few days after the sale to Plaintiffs. Am. Compl. ¶¶ 46 n.2, 58 n.6.

[3] Another purchaser, Nasir Shah, never had his purchase of three condo units from 4910 Georgia Ave Holdings, LLC recorded either. Am. Compl. ¶ 64; *see also Shah et al. v. DP Capital LLC et al.*, No. 23-cv-1102 (TJK), ECF No. 35 ¶¶ 66–67.

to WCP Fund I.  Am. Compl. ¶¶ 8, 70.  The lawyer prepared two Commercial Deeds of Trust

listing WCP Fund I as the lender and 4910 Georgia Ave Holdings, LLC as the borrower: one for

$852,872 ("$852K Deed of Trust") and another for $10,861,300 ("$10.86M Deed of Trust").  *Id.*

¶ 72; *see also* ECF No. 36-1 at 81, 104; *id.* at 135, 143.  Both documents were executed on August

5, 2020, but each was purportedly made effective as of July 31—*i.e.*, the day Plaintiffs closed on

the condominiums.  Am. Compl. ¶ 72; *see also* ECF No. 36-1 at 81, 100; *id.* at 143, 162.  Also on

August 5, the Developers and WCP executed a HUD-1 form—a standardized Housing and Urban

Development form that itemizes charges in mortgage transactions—showing the loan that WCP

Fund I had provided to 4910 Georgia Ave Holdings, LLC.  Am. Compl. ¶ 74.  Plaintiffs also say

that the HUD-1 reflects a "'closing cost' payment made by Borrowers (*i.e.*, 4910 Georgia Ave

Holdings, LLC) in the amount of $1.253 million," which is the sum of what Plaintiffs and the other

purchaser paid for the condominiums.  *Id.* ¶ 76; *see also* ECF No. 36-1 at 166.  But according to

Plaintiffs, the Developers and WCP Entities disguised these purchases to appear on the HUD-1 as

part of the Property's refinancing with WCP.  Am. Compl. ¶ 77.

After this flurry of transactions in mid-2020, Plaintiffs contend the Developers and WCP

Entities tried to conceal their interests in the Property.  Am. Compl. ¶ 78.  WCP, for example,

assigned its interest in the Property to "SF NU, LLC."  *Id.* ¶ 80; *see also* ECF No. 36-1 at 169–71.

Huertas also replaced himself with the lawyer as the trustee over the $852K Deed of Trust and,

with help from several WCP Entities and the lawyer, recorded an "Affidavit of Non-Residential

Mortgage Foreclosure" on the Property in April 2022.  Am. Compl. ¶¶ 82–83 (emphasis omitted);

*see also* ECF No. 36-1 at 173.  The finance director of WCP Fund I signed that affidavit on SF

NU's behalf, and then SF NU recorded a "Notice of Foreclosure Sale of Real Property or Condo-

minium Unit," which the lawyer signed as trustee.  Am. Compl. ¶¶ 83–84.  This notice said that

4910 Georgia Ave Holdings, LLC owed over $1 million on the $852K Deed of Trust Notice, that

the note was in default, and that the Property was thus subject to foreclosure. *Id.* ¶ 85; *see also*

ECF No. 36-1 at 176–78. And although the lawyer and Huertas knew about Plaintiffs' ownership

interest, the former conducted the foreclosure sale a month later without providing notice to Plain-

tiffs. Am. Compl. ¶¶ 86–87.

In late 2022, the lawyer allegedly sold the Property to "SF 4910 Georgia Ave NW LLC"

for $10,000 plus the $8 million needed to pay off the Deed of Trust that Huertas held as WCP

Fund I's trustee. Am. Compl. ¶¶ 88–89; *see also* ECF No. 36-1 at 181–85. The purchaser had the

same mailing address as the WCP Entities. Am. Compl. ¶ 90. Then, a few weeks later, SF 4910

Georgia Ave NW LLC "transferred its interest in the Property to Defendant WCP 4910 Georgia

Ave" for the price of $9,008,460, which Plaintiffs allege was the balance on the $10.86M Deed of

Trust. *Id.* ¶¶ 91–92; *see also* ECF No. 36-1 at 189. Long story short: WCP ended up with the

Property while effectively canceling Plaintiffs' ownership of the condominium units. Am. Compl.

¶ 99.

Plaintiffs sued in April 2023. In their Amended Complaint, they bring several claims

against the Developers—Charles Paret, 4910 Georgia Ave Holdings, LLC, and Coloma River

Holdings, LLC—including conversion (Count I), fraud and fraud in the inducement (Count II),

and violation of the D.C. Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-

3901 *et seq.* (Count VII). They also sue District Title under the DCCPPA (Count VII), as well as

for breach of fiduciary duties (Count III) and negligence (Count VI). Finally, Plaintiffs bring a

claim for unjust enrichment (Count IV) against the "WCP Entities"—DP Capital LLC, WCP Fund

I, and WCP 4910 Georgia Ave NW LLC.

District Title and the WCP Entities now separately move to dismiss all claims against each of them.  ECF Nos. 37, 39.

## II.    Legal Standard

A defendant may move to dismiss an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive such a motion, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[T]he Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  Still, the complaint must "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "mere conclusory statements" are not enough to establish a claim's facial plausibility, *Iqbal*, 556 U.S. at 678.

## III.    Analysis

### A.    Breach of Fiduciary Duty and Negligence Claims Against District Title

District Title moves to dismiss Plaintiffs' claims for breach of fiduciary duty and negligence.  As the parties appear to acknowledge, District of Columbia law governs these claims.  *See Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 27 (D.D.C. 2019) (explaining that DC's choice-of-law rules apply and select the law of the "jurisdiction with the most significant relationship to the dispute" in the event of a conflict).  Thus, stating a claim for breach of fiduciary duty requires Plaintiffs to allege that District Title "owed [them] a fiduciary duty," breached that duty, and in doing so proximately caused them to suffer an injury.  *Xereas v. Heiss*, 987 F.3d 1124, 1130 (D.C. Cir. 2021).  Similarly, for their negligence claim, Plaintiffs must allege that District Title "owed a duty to [them]," breached that duty, and proximately caused their injury with the breach.  *Poola v.*

*Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016).  District Title challenges Plaintiffs' claims only

on the first element: whether Plaintiffs have successfully pleaded that District Title owed them a

duty.[4]  *See* ECF No. 37-1 at 4–7.  As described below, they have.

Plaintiffs allege that District Title owed them a fiduciary duty and, by extension, a duty

sufficient to support their negligence claim too.  The law is clear: "Escrow agents owe a fiduciary

duty of care to both *buyer* and seller in a real estate transaction."  *Cap. River Enters., LLC v. Abod*,

301 A.3d 1234, 1242 (D.C. 2023) (emphasis added) (holding that a plaintiff stated a claim for

negligence given the existence of this duty).  Thus, an escrow agent owes a fiduciary duty to those

"who transfer funds into an escrow as well as those for whom the funds are held."  *World Class

Const. Mgmt. Grp. v. Baylor*, 962 F. Supp. 2d 296, 299 (D.D.C. 2013) (citing *Wagman v. Lee*, 457

A.2d 401, 404–05 (D.C. 1983)).  And this "escrow/depositor relationship . . . creates an independ-

ent fiduciary relationship between the parties," "regardless of [the] contractual underpinnings."

*Friends Christian High Sch. v. Geneva Fin. Consultants*, 39 F. Supp. 3d 58, 63 (D.D.C. 2014)

(internal quotation marks and citation omitted).

Despite sometimes focusing on District Title's status as a "trustee," *see* Am. Compl. ¶ 133,

Plaintiffs allege that District Title was acting as an escrow agent.  For example, they say that Kim

"placed $600,000 of funds into escrow with District Title" to buy the condominium units.  *Id.*

---

[4] The parties analyze the fiduciary-duty and negligence claims together because they arise
out of the same underlying conduct and "the law governing these two causes of action is similar."
ECF No. 37-1 at 4–5 (citing *Org. of Chinese Ams., Inc. v. Damron*, No. 22-cv-178 (BAH), 2023
WL 2301977, at *6 (D.D.C. Mar. 1, 2023)); ECF No. 42 at 7, 12 (agreeing with this approach).
*Damron*, however, highlighted the similarity between claims for breach of fiduciary duties and
"*professional* negligence."  *Damron*, 2023 WL 2301977, at *6 (emphasis added).  Although the
"fundamental principles of negligence law are also applicable in professional negligence cases,"
*Pannu v. Jacobsen*, 909 A.2d 178, 194 (D.C. 2006), the Court need not wade deeply into those
waters to address whether there are any differences between the two.  In this case, whether Plain-
tiffs have adequately pleaded the "duty" element of their fiduciary-duty and negligence claims is
functionally the same question.

¶ 131; *see also id.* ¶ 49 ("Those funds had already been wired by Dr. Kim to District Title to be held in escrow."); *id.* ¶ 106.   Plaintiffs also allege Paret told District Title multiple times "that escrow was to be held in Plaintiffs' name and not released until all parties at the Closing consented." *Id.* ¶¶ 103–04.   And on July 30, 2020—the day before the closing—"District Title (again) was specifically instructed that the funds placed by Plaintiffs into escrow were not to be released" without Kim's approval. *Id.* ¶ 105.   In sum, Plaintiffs allege that they provided funds to District Title as an escrow agent, and "[c]ertainly there can be no question as to the existence of the fiduciary capacity in a case where the agent has been entrusted with money to be used for a specific purpose." *Wagman*, 457 A.2d at 405 (citation omitted).   So as an escrow agent—and thus as a fiduciary—District Title owed several duties to Plaintiffs, including "a duty of good faith and candor." *Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992).

District Title's contrary arguments are unpersuasive.   To start, District Title briefly asserts that Kim lacks standing to bring any claims against it because "he is not, in his personal capacity, a party to an agreement" about the Property.   ECF No. 37-1 at 2.   But Plaintiffs allege that Kim entrusted District Title with $600,000, *see, e.g.*, Am. Compl. ¶ 106, and that District Title received the money with specific instructions about Kim's approval that it later disregarded, *see id.* ¶¶ 103–07.   Further, even if the specific names on the documents *might* make some difference, that does not mean as a matter of law that a fiduciary relationship did not exist under these circumstances. "District of Columbia law has deliberately left the definition of 'fiduciary relationship' flexible, so that the relationship may change to fit new circumstances in which a special relationship of trust may properly be implied." *Millenium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d 234, 248 (D.D.C. 2013) (citation omitted).   That flexibility "embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies

upon, another"—*i.e.*, precisely what Plaintiffs say they did when giving funds to District Title.
*Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 46 (D.D.C. 2010) (citation omitted).[5]

Nor does District Title's more substantive argument—that the negligence and fiduciary-
duty claims fail because District Title owed no duty to Plaintiffs—fare any better.  Plaintiffs allege
that District Title acted as an escrow agent, so it makes no difference whether, as District Title
argues, "[t]his matter does not involve [particular] types of trusts" described in the D.C. Code.
ECF No. 37-1 at 5.  Instead, "the 'escrow/depositor relationship, regardless of contractual under-
pinnings,' creates an 'independent fiduciary relationship between the parties.'"  *Friends Christian
High Sch.*, 39 F. Supp. 3d at 63 (quoting *Wagman*, 457 A.2d at 404).  Put simply, Plaintiffs allege
that they "transfer[red] funds into an escrow" with District Title, so District Title "ha[d] fiduciary
duties to" Plaintiffs.  *World Class Constr. Mgmt. Grp.*, 962 F. Supp. 2d at 299.  That is enough to
state a claim based on that duty.

District Title also contends that Plaintiffs' duty-based claims fail because it did not know
about the sales agreement between Plaintiffs and the Developers.  ECF No. 37-1 at 6.  But Plaintiffs
*do* allege that District Title knew about the agreement.  They say, for example, that District Title

---

[5] District Title also notes that Kim Georgia Ave, LLC was not a legal entity when Kim
bought the condominium units.  *See* ECF No. 37-1 at 2.  Plaintiffs acknowledge that Kim Georgia
Ave, LLC, was not "formally incorporated" until April 2023, *see* Am. Compl. ¶ 2, even though
the "New Construction Pre-Sales Agreement" lists "Kim Georgia Ave, LLC or its assigns" as the
buyer, *see* ECF No. 36-1 at 72.  But District Title does not expressly argue that Kim Georgia Ave,
LLC may not bring these claims.  *See* ECF No. 37-1 at 2.  And although Plaintiffs responded that
Kim Georgia Ave, LLC was a proper plaintiff, *see* ECF No. 42 at 5–7, District Title's reply never
mentions this potential argument about the corporate plaintiff, *see generally* ECF No. 43.  So to
the extent District Title raised this argument in its motion to dismiss, it has "conceded" the issue
for purposes of this briefing by "omit[ting] any reference to" Plaintiffs' arguments in "opposition."
*Cannon v. Wells Fargo Bank, N.A.*, 952 F. Supp. 2d 1, 11 (D.D.C. 2013); *see also Paleteria La
Michoacana, Inc.* v. *Productos Lacteos Tocumbo S.A. De C.V.*, No. 11-cv-1623 (RC), 2015 WL
13680780, at *1 n.3 (D.D.C. Apr. 2, 2015) ("In this Circuit, the failure to respond to an argument
raised in an opposition memorandum can result in a party conceding that issue.").

"was in possession of the executed Sale Agreement," Am. Compl. ¶ 108, and that it had been "specifically instructed that the funds placed by Plaintiffs into escrow were not to be released until" Kim gave authorization, *id.* ¶ 105. District Title, moreover, purportedly received those instructions multiple times. *See id.* ¶¶ 103–05. In any event, even if Plaintiffs had not alleged that District Title knew about the agreement, District Title never explains why such knowledge would be needed to state a claim. After all, that duty arises from the nature of the relationship, not from the escrow agent's awareness of particular agreements. *See, e.g.*, *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 30 (D.D.C. 2014) ("[E]scrow agents indeed have fiduciary duties to those who transfer funds into an escrow . . . ."). As described above, the allegations in the Amended Complaint support the claim that District Title violated the "duty of an escrow holder" to "comply strictly with the instructions of his principal." *Aronoff*, 618 A.2d at 687 (citation omitted). Similarly, District Title's belated argument that Paret authorized the disbursement through the HUD-1 does not move the needle. *See* ECF No. 43 at 2. To repeat: Plaintiffs allege that they told District Title to hold the funds pending authorization from *Kim*, not *Paret*, and that District Title disbursed the money without receiving the green light.

The negligence claim survives too. For all the above reasons, Plaintiffs adequately allege that District Title had a fiduciary duty, which supplies the duty for the negligence claim. *See Cap. River Enters.*, 301 A.3d at 1242–43 (Plaintiff "alleged sufficient facts to make out a claim of negligence" where the "[e]scrow agent[] owe[d] a fiduciary duty of care to [the] buyer . . . in a real estate transaction.").

### B.      DCCPPA Claim Against District Title

District Title next moves to dismiss Plaintiffs' claim that it violated § 28-3904 of the DCCPPA, which forbids "any person" from "engag[ing] in an unfair or deceptive trade practice."

That claim requires Plaintiffs to allege a consumer-merchant relationship with District Title.  Because Plaintiffs have not done so, their DCCPPA claim against District Title fails.

The D.C. Court of Appeals "has repeatedly concluded that the [DCCPPA] was designed to police trade practices arising only out of consumer-merchant relationships." *Archie v. U.S. Bank, N.A.*, 255 A.3d 1005, 1020 (D.C. 2021) (quoting *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011)).  Because the statute "does not protect merchants in their commercial dealings with suppliers or other merchants," a DCCPPA claim fails when there is no "consumer." *Ford v. ChartOne, Inc.*, 908 A.2d 72, 83 (D.C. 2006).  In turn, a "consumer" is "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services."[6]  D.C. Code § 28-3901(a)(2)(A).  And "[consumer] goods and services" covers "any and all parts of the economic output of society" so long as the purchaser obtains the good or service "for personal, household, or family purposes." *Id.* § 28-3901(a)(2)(B), (a)(7).  Together, these provisions establish that a "consumer" is "a person who receives or demands goods or services that are primarily for personal, household, or family use"—not one who transacts "primarily to promote business or professional interests." *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010).  This means that a transaction for a good or service that "might otherwise be considered a consumer good . . . is not subject to the [DCCPPA]" if the buyer enters the deal "for business reasons." *Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 173 (D.D.C. 2013).

Applied to the real-estate context, the "consumer" requirement mandates that the buyer purchase "property for use as a primary residence," so the DCCPPA does not cover "commercial

---

[6] A person who "provide[s] the economic demand for a trade practice" is also a consumer. D.C. Code § 28-3901(a)(2)(A).  But the DCCPPA defines "trade practice" to require the "sale, lease[,] or transfer[] of consumer goods or services." *Id.* § 28-3901(a)(6).  So the need for "consumer goods or services" applies to both definitions of "consumer."

transactions, *e.g.*, purchasing property as a financial investment." *Poblete v. Indymac Bank*, 657 F. Supp. 2d 86, 95 (D.D.C. 2009). Indeed, the statutory "definition of consumer excludes" those who buy "properties . . . for investment purposes only." *Bakeir v. Cap. City Mortg. Corp.*, 926 F. Supp. 2d 320, 333 (D.D.C. 2013); *see also Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d at 27 (dismissing DCCPPA claim where plaintiff did not plead facts supporting plausible inference that the good or service was "primarily for personal, household, or family use" (citation omitted)).

The question, then, is whether Plaintiffs plausibly allege that they purchased or received a good or service "for personal, household, or family purposes" during the allegedly fraudulent transaction. D.C. Code § 28-3901(a)(2)(B). They do not. The Amended Complaint "contains no factual allegations to indicate that the" purchased condominium units were "primarily for personal, household, or family use." *Hardy v. N. Leasing Sys., Inc.*, 953 F. Supp. 2d 150, 161 (D.D.C. 2013). Plaintiffs, for example, do "not allege that [Kim]" or any family members "resided at the 'subject property' at any time," or that Kim intended to when District Title "engaged in the alleged mis-conduct." *Hawthorne v. Rushmore Loan Mgmt. Servs., LLC*, No. 20-cv-393 (RDM), 2021 WL 3856626, at *13 (D.D.C. Aug. 30, 2021) (dismissing DCCPPA claim for failure to allege consumer status). To the contrary, Plaintiffs assert that Kim is a "resident of Maryland" and never suggest an intent to reside in any of the three condominiums. Am. Compl. ¶¶ 1–2. True, Plaintiffs note that the "Property was specifically marketed to Dr. Kim and sold as <u>residential</u> condo units." *Id.* ¶ 82 n.7. But that is not an allegation that *Plaintiffs* had a "personal or household use" for those units. *See Yudzon v. Sage Title Grp., LLC*, No. 18-cv-2076 (TFH), 2020 WL 2615579, at *5 (D.D.C. May 22, 2020) (dismissing DCCPPA claim even though plaintiff alleged that "at some point in the future he might use [the property unit] as his own personal residence"). Rather, especially absent a factual allegation to the contrary, the allegations in the Amended Complaint appear

to reflect the purchase of three condominium units to use them "as a business investment," *id.*, such as "renting the[] residential property," *Hawthorne*, 2021 WL 3856626, at *13. In short, nothing about the allegations in the Amended Complaint or any reasonable inferences from them suggest that the goods or services at issue were purchased for personal use. Thus, Plaintiffs fail to state a DCCPPA claim.

## C.    Damages Against District Title

District Title also moves to dismiss Plaintiffs' request for punitive damages and attorneys' fees, specifically for their negligence claim. ECF No. 36-1 at 7–9. Punitive damages and attorneys' fees, though, are not "actual count[s]"; they are "component[s] of Plaintiff[s'] prayer for relief." *Anderson v. Washington Hilton, LLC*, No. 21-cv-1140 (JEB), 2021 WL 3885724, at *2 (D.D.C. Aug. 31, 2021); *see also Int'l Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am.*, 81 F. Supp. 2d 70, 74 (D.D.C. 2000) ("[P]unitive damages is a remedy and not a freestanding cause of action . . . ."). For that reason, "courts in this Circuit have often construed a motion to dismiss punitive damages as a motion to strike," *Matella v. Murdock Street, LLC*, No. 21-cv-2112 (GMH), 2024 WL 3967367, at *19 (D.D.C. Aug. 28, 2024), and the Court will do so here for the request for those damages and for attorneys' fees. The question remains the same: have Plaintiffs alleged facts plausibly entitling them to either remedy for the negligence claim?

Start with punitive damages, which under District of Columbia law "are generally available only in actions arising from intentional torts." *Doe v. De Amigos, LLC*, 987 F. Supp. 2d 12, 17 (D.D.C. 2013). That is the end of the matter according to District Title; Plaintiffs' claim sounds in negligence, so punitive damages are unavailable. ECF No. 37-1 at 8. But the qualifier "generally" is telling. To be sure, "a *showing* of mere negligence" will not entitle a plaintiff to punitive damages. *De Amigos*, 987 F. Supp. 2d at 17 (emphasis added). But that does not mean that a negligence *cause of action* may never provide a basis for such damages. Indeed, the D.C. Court

of Appeals has explained that a "showing of ordinary negligence . . . will not support an award of punitive damages," "*absent any proof of exacerbating circumstances*"—an unnecessary proviso if negligence claims could never support requests for punitive damages. *Price v. Griffin*, 359 A.2d 582, 589 (D.C. 1976) (emphasis added). This focus on the defendant's conduct and mental state rather than the cause of action makes sense. After all, the "test for punitive damages"—which asks if the defendant "*acted* with evil motive, actual malice, or in willful disregard for the rights of the plaintiff"—is "rigorous" but is ultimately keyed to the defendant's behavior, not the cause of action. *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP*, 985 A.2d 443, 456 (D.C. 2009) (emphasis added) (citation omitted). That is why "[p]unitive damages claims have long been deemed compatible with a negligence cause of action despite the fact that considerably more, and sometimes different, proof is required to establish that a defendant's conduct was 'willful and wanton' or 'malicious' rather than merely negligent." 3 *Owen & Davis on Products Liability* § 26:20 (4th ed. 2024) (noting "the invalid assumption that punitive damage claims must be established by facts identical to those supporting the underlying claim"). Thus, District Title's focus on Plaintiffs' "*claim*[] of negligence" is unavailing. ECF No. 37-1 at 9 (emphasis added).

Otherwise, Plaintiffs have alleged facts that plausibly entitle them to punitive damages for District Title's conduct; District Title simply does not engage with the facts as alleged. For instance, Plaintiffs say that District Title "released the entirety of the $600,000 that Plaintiffs had put in escrow[] without seeking or receiving Plaintiffs' permission," even though District Title had been told that it could not disburse the funds without such authorization. Am. Compl. ¶¶ 103–105, 109. Not only that, but they contend that District Title also apparently knew about the other Defendants' "involvement with the Property" and "facilitated" that "scheme for its own benefit." *Id.* ¶ 116. These allegations are enough to assert that District Title's conduct was "outrageous" and

"malicious[]"—or, at the very least, that District Title "reckless[ly] or willful[ly] disre-

gard[ed] . . . [Plaintiffs'] rights." *Henson v. W.H.H. Trice & Co.*, 466 F. Supp. 2d 187, 193 (D.D.C.

2006). In other words, Plaintiffs have alleged that this is not a "run-of-the-mill negligence case"

but one with "aggravating circumstances that would make punitive damages available." *De Ami-*

*gos, LLC*, 987 F. Supp. 2d at 18. That said, of course, whether Plaintiffs will "satisfy[] th[e]

demanding standard" for *proving* that they are entitled to punitive damages is another matter. *Hen-*

*son*, 466 F. Supp. 2d at 193.

As for attorneys' fees, District of Columbia law "follows the American Rule," which gen-

erally requires that "every party to a case shoulder[] its own attorneys' fees." *Psaromatis v. Eng-*

*lish Holdings, LLC*, 944 A.2d 472, 490 (D.C. 2008) (quoting *Oliver T. Carr Co. v. United Techs.*

*Commc'ns Co.*, 604 A.2d 881, 883 (D.C. 1992)). Recovering fees from other litigants is possible

"only in the presence of statutory authority, a contractual arrangement, or certain narrowly-defined

common law exceptions." *Id.* Seeking refuge in the first carveout, Plaintiffs argue that the

DCCPPA expressly permits the recovery of attorneys' fees. From there, they seem to reason that

attorneys' fees are on the table for their negligence claim because they also allege a violation of

the DCCPPA. Not so.

The Court need not decide whether an adequately alleged DCCPPA claim would support

an award of attorneys' fees for Plaintiffs' negligence claim, as dubious as that may sound. As

described above, Plaintiffs have failed to state a DCCPPA claim against District Title, so they lack

an anchor claim that could provide for fees even under this novel theory. Put differently, "the

[DCCPPA] allows *prevailing* plaintiffs to recover" attorneys' fees for any claim under the

DCCPPA. *Sloan v. Soul Circus, Inc.*, No. 15-cv-1389 (RC), 2015 WL 9272838, at *7 (D.D.C.

Dec. 18, 2015) (emphasis added). But because Plaintiffs cannot prevail on a "claim *under this*

15

*chapter*," *see* D.C. Code § 28-3905(k)(2) (emphasis added), they may not "recover . . . [r]easonable attorney's fees" for an unrelated common-law claim, *id.* § 28-3905(k)(2)(B).

### D.        Unjust-Enrichment Claim Against the WCP Entities

For their part, the WCP Entities move to dismiss the sole claim against them: unjust enrichment. "[B]ased on a contract implied in law," unjust enrichment "is an equitable quasi-contract claim," *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (citation omitted), that arises "when a person retains a benefit (usually money) which in justice and equity belongs to another," *Jordan Keys & Jessamy, LPL v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005). A plaintiff bringing an unjust-enrichment claim must allege that he "conferred a benefit on the defendant," that "the defendant retain[ed] the benefit," and that "under the circumstances, the defendant's retention of the benefit is unjust." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)). When assessing these claims, courts must look to "the nature of the dealings between the recipient of the benefit and the party seeking restitution." *4934, Inc. v. D.C. Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992).

Plaintiffs' allegations cover each element. They contend that they conferred a benefit "by paying $600,000 for the purchase of the Condo Units." Am. Compl. ¶ 137. That money, Plaintiffs say, made its way to the WCP Entities. *Id.* And the WCP Entities retained this benefit unjustly because Plaintiffs provided those funds for condominiums that they never received—a bait-and-switch that the WCP Entities purportedly knew about. *Id.* ¶¶ 138–39.

The WCP Entities offer four reasons why these allegations fall short: (1) Plaintiffs conferred no benefit on the WCP Entities; (2) the WCP Entities did not retain any benefit that was conferred; (3) any retention was not unjust; and (4) the economic-loss rule bars recovery. *See* ECF No. 39 at 6–11. None persuades. The first three ignore Plaintiffs' well-pleaded allegations and

the Rule 12(b)(6) standard that requires the Court to accept them as true at this stage. And the fourth misunderstands the scope of the economic-loss rule.

The WCP Entities' argument that other entities (not Plaintiffs) paid other Defendants (not the WCP Entities) fails to grapple with Plaintiffs' allegations. According to the WCP Entities, Plaintiffs allege only that Kim Georgia Ave, LLC "conferred a benefit upon" 4910 Georgia Ave Holdings, LLC—not upon any WCP entity. ECF No. 39 at 7. But Plaintiffs allege more than that. They claim to have paid $600,000 for the condominiums and say that this "money was subsequently paid over to the WCP Entities." Am. Compl. ¶ 137. And regardless of the precise route the benefit took—that is, whether it went directly to the WCP Entities or had a layover in the accounts of other entities—Plaintiffs allege that they provided money that wound up with the WCP Entities. That allegation is sufficient because "the theory of unjust enrichment" may "apply to indirect payments." *Glasgow v. Camanne Mgmt., Inc.*, 261 A.3d 208, 221 (D.C. 2021) (quoting *JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 523 n.5 (D.D.C. 2014)); *see also, e.g.*, *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 256 (D.D.C. 2015) ("[A] number of decisions from this Court have expressly held that a benefit indirectly conferred on a defendant can support an unjust enrichment claim.").

Switching gears, the WCP Entities assert that because their deal with the Developers included payments to both the WCP Entities *and* the payment of debts and liens to *other* entities, Plaintiffs' funds "can be viewed as having gone to" that latter group of payments rather than to the WCP Entities. ECF No. 39 at 8. If that is true, then the WCP Entities never "retained the at-issue benefit." *Id.* at 7. In other words, the WCP Entities ask the Court to infer that Plaintiffs' funds never made it to them, because the "more sensible" inference is that the money loaned by the WCP Entities covered the costs related to that loan. *Id.* at 8.

This argument "misunderstands the standard of review applicable to Rule 12(b)(6) motions." *JSC Transmashholding*, 70 F. Supp. 3d at 522. The Court not only "assumes the veracity of any well-pleaded factual allegations," but it also gives Plaintiffs the "benefit of all inferences that can be derived from the facts alleged." *Id.* (citation omitted) (cleaned up). Plaintiffs say that their payments were delivered to the WCP Entities. Am. Compl. ¶ 137. Even if the loan document creates competing inferences such that the funds "can be viewed" as having gone to different entities, ECF No. 39 at 8, Plaintiffs have plausibly alleged that the WCP Entities retained a benefit.

The WCP Entities also contend that there is nothing unjust about retaining reasonable processing and origination fees for the loan that they provided to the Developers. Both their premise and conclusion are wrong. To start, Plaintiffs allege that the WCP Entities *knew* about the scheme to take Plaintiffs' money without ever providing the condominium units. Am. Compl. ¶¶ 66, 138. Even so, the WCP Entities retained Plaintiffs' funds after "effectively transferr[ing] the Property" through a series of conveyances that "cancel[led] Dr. Kim's ownership." *Id.* ¶¶ 94, 138–39. Plaintiffs have thus plausibly alleged that the WCP Entities wrongly retained a benefit that "in justice and equity belongs to another." *Jordan Keys & Jessamy, LLP*, 870 A.2d at 63.

More important, the WCP Entities conflate the unjustness of the retention with the culpability of the recipient. The latter is not an element of unjust enrichment. To the contrary, such a claim "does not require fault on the part of the recipient of the benefit," *4934, Inc.*, 605 A.2d at 56, because "[h]is innocence in receiving the benefit does not mean that his retention of that benefit without payment is just," *JSC Transmashholding*, 70 F. Supp. 3d at 523. So even if Plaintiffs had not alleged that the WCP Entities had a hand in the fraudulent scheme, the unjust-enrichment claim would not fail for that reason alone.

The WCP Entities also miss the mark with their argument that the economic-loss rule bars

Plaintiffs' claim.  Under that rule, "a plaintiff who suffers only pecuniary injury as a result of the

conduct of another cannot recover those losses *in tort*."  *William Loveland Coll. v. Distance Educ.*

*Accreditation Comm'n*, 347 F. Supp. 3d 1, 19 (D.D.C. 2018) (emphasis added) (quoting *Aguilar*

*v. RP MRP Washington Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014)).  Unjust enrichment, how-

ever, is a "claim in quasi *contract*."  *Jordan Keys & Jessamy, LLP*, 870 A.2d at 62–63 (emphasis

added) (explaining that "unjust enrichment . . . has its roots in the common law concept of quasi-

contract").  And as "an equitable quasi-contract claim based on a contract implied in law," unjust

enrichment is not rooted in a tort duty owed to the plaintiff.  *In re APA Assessment Fee Litig.*, 766

F.3d at 46 (internal quotation marks and citation omitted); *cf. Shalom v. Smith*, 304 A.3d 983, 986

(D.C. 2023) ("Disgorgement sounds in principles of unjust enrichment and restitution—which are

quasi-equitable doctrines—not in tort.").  So the "economic loss doctrine," which "is based on the

rationale that there is no general *tort duty* to refrain from conduct that leads to another party's

solely pecuniary injury," does not affect Plaintiffs' claims.  *Heidi Aviation, LLC v. Jetcraft Corp.*,

573 F. Supp. 3d 182, 199 (D.D.C. 2021) (emphasis added).

The WCP Entities cite a host of cases to support their view of the economic-loss rule, but

none provides a reason to apply it here.  First, they point to several decisions where courts applied

the rule in "cases centered upon the ownership of real estate."  ECF No. 39 at 10.  But each case

did so while addressing a negligence claim, so the mere involvement of real estate is no basis for

extending the economic-loss rule to unjust-enrichment claims.  *See Singer v. Bulk Petroleum*

*Corp.*, 9 F. Supp. 2d 916, 921–22 (N.D. Ill. 1998) ("[Plaintiff] is attempting to recover economic

losses and, thus, her negligence claim is barred by the economic loss doctrine."); *Metal Processing*

*Co., Inc. v. Amoco Oil Co.*, 926 F. Supp. 828, 832–33 (E.D. Wisc. 1996) (applying economic-loss

rule to claims "grounded in tort"); *Reighard v. Yates*, 285 P.3d 1168, 1174 (Utah 2012) ("The

economic loss rule prevents recovery of economic damages under a theory of tort liability when a

contract covers the subject matter of the dispute."); *Palco Linings, Inc. v. Pavex, Inc.*, 755

F. Supp. 1269, 1270 (M.D. Pa. 1990) ("Plaintiff's claims . . . are for negligence and negligent mis-

representation in connection with the project.").

Second, the WCP Entities highlight two cases purportedly establishing that unjust enrich-

ment "manifestly sounds in tort." ECF No. 39 at 11. Not so. As explained, "[u]njust enrichment

is an equitable quasi-contract claim based on a contract implied in law." *In re APA Assessment

Fee Litig.*, 766 F.3d at 46 (internal quotation marks and citation omitted). Angling to avoid this

definition, the WCP Entities say that courts in this District have referred to the "tort" of unjust

enrichment. *See JSC Transmashholding*, 70 F. Supp. 3d at 525; *Taylor v. FAA*, 351 F. Supp. 3d

97, 99 (D.D.C. 2018). That argument stretches the language in these cases too far. True, *JSC

Transmashholding* referred once to "the torts of conversion and unjust enrichment." 70

F. Supp. 3d at 525. But it did so in passing, and the opinion later made clear that "[t]he District of

Columbia recognizes unjust enrichment as a species of quasi contract." *Id.* at 522. *Taylor*, for its

part, dismissed the plaintiff's suit for lack of standing. 351 F. Supp. 3d at 99. The Court thus does

not read *Taylor*'s background reference to "the common law tort of unjust enrichment"—a claim

the *Taylor* court never discussed—as a statement about the nature of that claim. *Id.* at 99. In any

event, to the extent either decision conflicts with the established rule in the District of Columbia

that "[u]njust enrichment is quasi-contractual in nature," *Peart v. Dist. of Columbia Hous. Auth.*,

972 A.2d 810, 813 (D.C. 2009), the latter controls.

## IV.    Conclusion and Order

For all the above reasons, it is hereby **ORDERED** that Defendant District Title's Motion

to Dismiss, ECF No. 37, is **GRANTED IN PART** and **DENIED IN PART**. The Motion is

**GRANTED** insofar as it seeks to dismiss Plaintiffs' claim under the District of Columbia Consumer Protection Procedures Act and Plaintiffs' requests for attorneys' fees for their negligence claim, but it is **DENIED** insofar as it seeks to dismiss Plaintiffs' claims for breach of fiduciary duty and negligence, and their request for punitive damages.  It is further **ORDERED** that the WCP Defendants' Motion to Dismiss, ECF No. 39, is **DENIED**.

     **SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 20, 2024