# Exhibit 10

**AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**1260 HOLBROOK HOLDINGS LLC**

## AMENDED AND RESTATED OPERATING AGREEMENT

<u>1260 Holbrook Holdings LLC</u>

THIS AMENDED AND RESTATED OPERATING AGREEMENT ("Agreement"), made effective as of the 8th day of April, 2020 ("Effective Date"), is entered into by and between Daniel Huertas ("Huertas") and Charles Paxton Paret ("Paxton") each of whom is referred to individually as "Member" and collectively as "Members." In consideration of the mutual promises contained in this Agreement, the Members agree as follows:

This Agreement amends and restates that certain Operating Agreement ("Original Agreement") made effective as of the 23rd day of August, 2018 by Paxton as sole member. This Agreement supersedes the Original Agreement and any amendment thereto and any subsequent operating agreement and any amendment thereto.

Paxton represents and warrants to Huertas as follows: (1) From the formation of the Company (defined below) until the Effective Date, the sole member of the Company was Paxton. (2) The Company is the rightful and record owner of the improved real property commonly known as 1260 Holbrook Terrace, NE, Washington, DC (Lot 49 in Square 4055) ("Property"). (3) All of the membership interests of the Company are freely transferable and unencumbered. (4) Paxton has not entered into any agreement of any kind with respect to the Company except as disclosed in writing to Huertas. (5) The Company has not entered into any agreement of any kind with respect to the Property except as disclosed in writing to Huertas. (6) Except with respect to the lien of non-delinquent real estate taxes and water/sewer charges, the Property is unencumbered by any monetary lien except (a) that certain Deed of Trust ("WCP 1st Deed of Trust") recorded on September 7, 2018 as Document No. 2018090426 in the principal amount of $1,380,000.00 and (b) that certain Deed of Trust ("WCP 2nd Deed of Trust") recorded on September 7, 2018 Document No. 2018090427 in the principal amount of $758,100.00. (7) The lien of that certain Deed of Trust ("Welch Family Deed of Trust") recorded on February 27, 2019 as Document No. 2019019407 in the principal amount of $460,000.00 no longer encumbers the Property.

For good and valuable consideration, the receipt and adequacy of which Paxton hereby acknowledges, Paxton transfers to Huertas (a) 51% of the membership interests of the Company as well as (b) all control and management of the Company and the Property. From the Effective Date and continuing thereafter, Huertas shall own 51% of the membership interests of the Company and Paxton shall own 49% of the membership interests of the Company. Paxton will defend, indemnify, and hold harmless Huertas from and against any and all claims and/or damages arising out of Paxton's control and management of the Company and the Property during the time period commencing with the formation of the Company and continuing until the Effective Date. The aforementioned "claims and/or damages" shall include any and all debts of the Company.

<u>Notwithstanding anything in this Agreement to the contrary, the Members understand and agree as follows</u>: (1) Huertas has made an initial capital contribution of $750,000.00 and Paxton has made an initial capital contribution of $0.00. (2) Within twelve (12) months of the Effective Date, *time being of the essence*, Paxton shall pay $375,000.00 ("Initial Capital Contribution Reimbursement") to

Huertas, the effect of which shall be to reduce the initial capital contribution of Huertas to $375,000.00 and to increase the initial capital contribution of Paxton to $375,000.00. (3) Commencing upon the Effective Date and continuing until Paxton pays the Initial Capital Contribution Reimbursement to Huertas, Paxton shall not be entitled to any disbursements, payments, reimbursements, etc. of any kind whatsoever from the Company and/or from Huertas. Any and all such disbursements, payments, reimbursements, etc. to which Paxton would have been entitled shall be payable to and shall irrevocably be the property of Huertas. (4) If Paxton does not pay the Initial Capital Contribution Reimbursement to Huertas within twelve (12) months of the Effective Date, *time being of the essence*, then Paxton shall not be entitled at any time to any disbursements, payments, reimbursements, etc. of any kind whatsoever from the Company and/or from Huertas. Any and all such disbursements, payments, reimbursements, etc. to which Paxton would have been entitled shall be payable to and shall irrevocably be the property of Huertas. (5) When the WCP 1st Deed of Trust is paid off and refinanced, the WCP 2nd Deed of Trust shall remain a lien encumbering the Property in the principal amount of no less than $750,000.00.

## ARTICLE 1

## THE LIMITED LIABILITY COMPANY

Section 1.1 <u>Formation</u>. The Members hereby form a limited liability company upon the terms and conditions provided in this Agreement, subject to the provisions of Title 13.1, Chapter 12, the District of Columbia Limited Liability Company Act (the "Act"), as the same may be amended from time to time and any successor to such Act.

Section 1.2 <u>Name</u>. The name of the limited liability company shall be 1260 Holbrook Holdings LLC (the "Company").

Section 1.3 <u>Articles of Organization</u>. On August 21st, 2018, Paxton caused the Articles of Organization for 1260 Holbrook Holdings LLC, a limited liability company under the laws of the District of Columbia, to be filed with the District of Columbia Government. In the future, the Members shall execute such further documents and take such further action as shall be appropriate or necessary to comply with the requirements of law for the formation and operation of a limited liability company in all jurisdictions where the Company elects to carry on its business.

Section 1.4 <u>Business</u>. The purposes for which the Company is organized are (i) the investment, ownership and management of real property, (ii) the investment, ownership and management of personal property, (iii) other lawful investments, (iv) to engage in all other lawful activities as are reasonably necessary to carry out the foregoing purposes of the Company and (v) to engage in all activities pursuant to and in accordance with §13.1-1008 of the District of Columbia Limited Liability Act. The Company may sell or otherwise dispose of all or substantially all of its assets and any such sale or disposition shall be considered to be within the scope of the Company's business.

Section 1.5 <u>Principal Office; Registered Agent</u>. The principal office of the Company will be located at 1140 3rd Street, NE, Suite 2152, Washington, DC 20002, unless and until changed by

Huertas in his sole and absolute discretion. The name and address of the initial agent for service of process of the Company is Charles Paxton Paret at 1140 3rd Street, NE, Suite 2152, Washington, DC 20002, unless and until changed by Huertas in his sole and absolute discretion.

Section 1.6 <u>Additional Members</u>. Additional Members shall not be admitted to the Company without the prior written consent of Huertas.

## ARTICLE 2

## DEFINITIONS

Section 2.1 <u>Cash Flow</u>. "Cash Flow" shall mean the excess of all cash receipts of the Company over all cash disbursements of the Company except that cash flow shall not include any amount that represents a return of the capital invested by the Company that is being held for reinvestment or for return to the Members under Section 4.2(a).

Section 2.2 <u>Code</u>. "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

Section 2.3 <u>Manager or Managers</u>. "Manager" or "Managers" shall mean Huertas, unless and until Huertas designates in writing a replacement Manager or Managers. Huertas, acting alone, shall control and manage the Company and the Property. Paxton shall have no control and no management authority with respect to the Company and/or the Property. Without in any way limiting his authority, the Members explicitly state that Huertas, acting alone, shall be authorized to cause the Company to encumber the Property and/or to sell the Property — all in Huertas's sole and absolute discretion.

Section 2.4 <u>Profit or Loss</u>. "Profit" or "Loss" shall mean the profit or loss of the Company as determined under the capital accounting rules of Treasury Regulation §1.704- 1(b)(2)(iv) for purposes of adjusting the capital accounts of the Members, including, without limitation, the provisions of paragraphs (b), (f), and (g) of those regulations relating to the computation of items of income, gain, deduction, and loss.

Section 2.5 <u>Sharing Ratio</u>. The "Sharing Ratio" of each Member shall be as follows:

| Member | Ratio |
|---|---|
| Huertas | 51% |
| Paxton | 49% |

Section 2.6 <u>Treasury Regulations</u>. "Treasury Regulations" shall mean regulations promulgated by the Department of Treasury under the Code. Any reference to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations promulgated under the Code.

Section 2.7 <u>Voting Interest</u>. "Voting Interest" shall mean a number of votes equal to a Member's Sharing Ratio multiplied by 100.

# ARTICLE 3

## CAPITAL CONTRIBUTIONS

Section 3.1 Initial Capital Contributions. Upon execution of this Agreement, the Members shall make initial capital contributions to the Company in the following amounts:

| | |
|---|---|
| Huertas | $750,000.00 |
| Paxton | $0.00 |

Section 3.2 Additional Capital Contributions. If additional capital contributions are required at any time, any of the following steps may be taken, but only with the prior written consent of Huertas:

(a) the necessary amount may be contributed by one or more of the existing Members in such shares as they may agree upon and the Sharing Ratios may be adjusted accordingly;

(b) a new Member may be admitted to the Company and make part or all of the required contribution and the Sharing Ratios may be adjusted accordingly; or

(c) the funds may be borrowed from any source, including any existing Member or Members.

Section 3.3 Return of Capital Contributions. Capital contributions shall be expended in furtherance of the business of the Company. All costs and expenses of the Company shall be paid from its funds. No Manager shall have any personal liability for the repayment of any capital contribution to a Member.

# ARTICLE 4

## DISTRIBUTIONS

Section 4.1 Non-liquidating Distributions. The Company may (in the sole and absolute discretion of Huertas) return to the Members their capital contributions at any time; provided, however, that Paxton shall be entitled to nothing if Huertas does not timely receive the Initial Capital Contribution Reimbursement. The Company may (in the sole and absolute discretion of Huertas) make distributions of Cash Flow to the Members at any time; provided, however, that Paxton shall be entitled to nothing if Huertas does not timely receive the Initial Capital Contribution Reimbursement.

Section 4.2 Liquidating Distributions. All distributions made in connection with the dissolution of the Company pursuant to Article 12 shall be made to the Members in the following

order of priority (provided, however, that Paxton shall be entitled to nothing if Huertas does not timely receive the Initial Capital Contribution Reimbursement):

(a) first, to the Members in proportion to each Member's initial capital contributions set forth under Article 3, until each Member's capital contributions have been returned in full under this paragraph (a); then

(b) the balance, 51% to Huertas and 49% to Paxton.

## ARTICLE 5

## ALLOCATION OF PROFIT AND LOSS

Section 5.1 Determination of Profit and Loss. Profit or Loss shall be determined on an annual basis and for such other periods as may be required.

Section 5.2 Profit Allocation. All Profits shall be allocated among the Members in accordance with their Sharing Ratios; provided, however, that Paxton shall be entitled to nothing if Huertas does not timely receive the Initial Capital Contribution Reimbursement.

Section 5.3 Allocation of Losses. All Losses shall be allocated among the Members in accordance with their Sharing Ratios.

## ARTICLE 6

## ALLOCATION OF TAXABLE INCOME AND LOSS

Section 6.1 In General.

(a) Except as provided in paragraph 6.1(b) and Section 6.2, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for capital account purposes under Article 5 (provided, however, that Paxton shall be entitled to nothing if Huertas does not timely receive the Initial Capital Contribution Reimbursement).

(b) To the extent of any recapture income (as defined below) resulting from the sale or other taxable disposition of a Company asset, the amount of any gain from such disposition allocated to (or recognized by) a Member (or its successor in interest) for federal income tax purposes shall be deemed to consist of recapture income to the extent such Member (or such Member's predecessor in interest) has been allocated or has claimed any deduction directly or indirectly giving rise to the treatment of such gain as recapture income. For this purpose "recapture income" shall mean any gain recognized by the Company (but computed without regard to any adjustment required by sections 734 and 743 of the Code) upon the disposition of any property or asset of the Company that does not constitute capital gain for

federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

Section 6.2 <u>Allocation of Section 704(c) Items</u>. The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulation section 1.704-1(b)(2)(iv)(f), there will be a difference between the agreed values or "carrying values" of such property at the time of contribution or revaluation and the adjusted tax basis of such property at that time.  All items of tax depreciation, cost recovery, amortization, and amount realized, and gain or loss with respect to such assets shall be allocated among the Members to take into account the book-tax disparities in accordance with the provisions of sections 704(b) and 704(c) of the Code and the Treasury Regulations under those sections.

Section 6.3 <u>Integration with Section 754 Election</u>. All items of income, gain, loss, deduction, and credit recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions of this Agreement, and all basis allocations to the Members, shall be determined without regard to any election under section 754 of the Code that may be made by the Company; provided, however, that such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by sections 734 and 743 of the Code.

Section 6.4 <u>Allocation of Tax Credits</u>. All tax credits with respect to the Company's expenditure of funds shall be allocated in the same manner as the allocation of Profit for the period during which the expenditures giving rise to the tax credit are incurred. If there is no Profit during such period, tax credits shall be allocated in accordance with the Members' respective Sharing Ratios (provided, however, that Paxton shall be entitled to nothing if Huertas does not timely receive the Initial Capital Contribution Reimbursement).

# ARTICLE 7

# **MANAGEMENT**

Section 7.1 <u>Management Authority</u>.

(a) Management of the Company shall be vested in the Manager. The Manager shall have the power and authority to conduct the business of the Company and is hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions.

(b) Any document executed on behalf of the Company for the purpose of buying or selling properties on behalf of the Company must be signed by the Manager. No one other than the Manager need sign any such document.

Section 7.2 <u>Management Responsibilities</u>. Huertas shall have the authority to manage the day-to-day operations of the Company including the renovation of properties owned by the Company.

Section 7.3 <u>Duties</u>. The Manager shall carry out his duties in good faith, in a manner that he believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. If the Manager so performs his duties, he shall not have any liability by reason of being or having been a Manager of the Company. The Manager shall devote such time to the business of the Company as the Manager, in his sole and absolute discretion, deems necessary for the efficient carrying on of the Company's business. The Manager shall at all times be free to engage in any business for his own account.

Section 7.4 <u>Number</u>. Initially, there shall be one Manager.

Section 7.5 <u>Tenure and Removal</u>. The initial Manager shall be Huertas, and Huertas shall remain the Manager of the Company unless and until he appoints a replacement or replacements in his sole and absolute discretion.

Section 7.6 <u>Reliance by Third Parties</u>. No third party dealing with the Company shall be required to ascertain whether the Manager is acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Manager as binding the Company.

Section 7.7 <u>Resignation</u>. The Manager may resign at any time by giving written notice of resignation to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt by the Members and the acceptance of the resignation shall not be necessary to make it effective.

Section 7.8 <u>Newly Created Manager Positions and Vacancies</u>. Newly created Manager Positions resulting from an increase in the number of Managers shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until his successor has been elected and qualified. Vacancies occurring for any reason shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a vacancy shall be elected to hold office for the unexpired term of his predecessor.

Section 7.9 <u>Transactions Between Company and Manager</u>. Any Manager, on behalf of the Company, may contract and deal with himself and may cause any person or entity affiliated with the Manager to contract or deal with the Company.

Section 7.10 <u>Management Fees and Reimbursements</u>. The Manager shall not be entitled to a management fee or salary for managing the operations of the Company. The Manager shall, however, be reimbursed by the Company for reasonable out-of-pocket costs incurred on behalf of the Company.

Section 7.11 <u>Insurance</u>. The Company shall maintain, for the protection of the Company and all of its Members, such insurance as the Manager, in his sole and absolute discretion, deems necessary for the operations being conducted.

Section 7.12 <u>Exculpation</u>. The Manager shall not be liable to the Company nor to any Member for any act or failure to act, nor for any errors of judgment, but only for willful misconduct or gross negligence. The Company shall indemnify and hold harmless the Manager and the agents and employees of the Manager against and from any personal loss, liability, or damage incurred as a result of any act or omission, or any error of judgment, unless such loss, liability, or damage results from such person's willful misconduct or gross negligence. Any such indemnification shall be paid only from the assets of the Company, and no Manager or third party shall have recourse against the personal assets of any Member for such indemnification.

## ARTICLE 8

## MEMBERS

Section 8.1 <u>Participation</u>. A Member, in his capacity as a Member, shall take no part in the control, management, direction, or operation of the affairs of the Company and shall have no power to bind the Company.

Section 8.2 <u>Quorum</u>. A majority of the outstanding Voting Interests, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members. Each of the Members hereby consents and agrees that one or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of the majority of the Voting Interests represented at the meeting and entitled to vote on the subject matter shall be the act of the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

Section 8.3 <u>Informal Action</u>. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by each Member entitled to vote. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

Section 8.4 <u>Annual Meeting</u>. Unless waived by Huertas in his sole and absolute discretion, the annual meeting of the Members shall be held on the first Saturday in January beginning in 2021, at the hour of 1:00 PM, local time, or at such other time and on such other day within such month, as shall be fixed by the Manager, for the transaction of such business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

Section 8.5 <u>Special Meetings</u>. Special meetings of the Members for any purpose or purposes may be called by the Manager or by the holders of not less than fifty-percent (50%) of all Voting Interests.

Section 8.6 <u>Place of Meeting</u>. The Manager may designate the place of meeting for any annual meeting and the person calling a special meeting may designate the place for such special meeting. If no designation is made, the place of meeting shall be the registered office of the Company.

Section 8.7 <u>Notice of Meeting</u>. Written notice, given five (5) days in advance of a meeting, stating the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered either personally or by mail, by or at the direction of any Manager or other person calling the meeting, to each Member of record entitled to vote at such meeting. If mailed, such notice shall be deemed delivered as provided in the Act. Waiver of notice and actions taken at a meeting shall be effective as provided in the Act.

Section 8.8 <u>Proxies</u>. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by the Member's duly authorized attorney-in-fact. Such proxy shall be filed with any Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

Section 8.9 <u>Conduct of Meeting</u>. At each meeting of the Members, a Chairperson for that particular meeting shall be elected. The Chairperson shall be the Member in attendance who has received the vote of the majority of the Voting Interests represented at the meeting. The Chairperson shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting. Following each meeting, the minutes of the meeting shall be sent to the Managers and each Member.

Section 8.10 <u>Tax Matters Partner</u>. Pursuant to section 6231(a) of the Code, Huertas is hereby designated as the tax matters partner for the Company. Huertas is authorized to perform, on behalf of the Company or any Member, any act that may be necessary to make this designation effective.

## ARTICLE 9

## ACCOUNTING AND REPORTING

Section 9.1 <u>Books</u>. The Company shall maintain complete and accurate books of account at the registered office of the Company. The Company shall provide any Member any information requested relating to the business of the Company. During ordinary business hours, any Member or that Member's authorized representative shall have access to all books, records, and materials regarding the Company and its activities.

Section 9.2 Capital Accounts. The Company shall maintain a separate capital account for each Member in accordance with the Treasury Regulations under section 704(b) of the Code and such other accounts as may be necessary or desirable to comply with the requirements of applicable laws and regulations.

Section 9.3 Transfers During Year. In order to avoid an interim closing of the Company's books, the share of profits and losses under Article 5 of a Member who transfers part or all of its interest in the Company during the Company's accounting year may be determined by taking the transferring Member's pro rata share of the amount of such profits and losses for the year. The proration shall be based on the portion of the Company's accounting year which has elapsed prior to the transfer, or may be determined under any other reasonable method; provided, however, that any gain or loss from the sale of Company assets shall be allocated to the owner of the transferred interest at the time of such sale. The balance of the profits and losses attributable to the transferred interest shall be allocated to the transferee of such interest.

Section 9.4 Reports. The books of account shall be closed promptly after the end of each fiscal year.

Section 9.5 754 Election. If requested by a Member, the Company shall make the election provided for under section 754 of the Code. Any costs attributable to making such election shall be borne solely by the requesting Member.

## ARTICLE 10

## TRANSFERS – RIGHT OF FIRST REFUSAL

Section 10.1 Restrictions. Notwithstanding anything to the contrary contained in this Agreement, no Member shall sell, assign, pledge, or otherwise transfer or dispose of any portion of his interest in the Company without the prior written approval of Huertas.

## ARTICLE 11

## TERM

Section 11.1 Events of Dissolution. The Company shall continue until dissolved by any of the following events:

    (a)    the written direction of Huertas;

    (b)    the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company; or any other event causing dissolution of a limited liability company under the Act.

Section 11.2 Continuity of Company. Notwithstanding the foregoing provisions of Section 11.1, upon the occurrence of an event described in Section 11.1(b), the remaining Members shall

have the right to continue the business of the Company. Such right may be exercised only if a majority in interest of the remaining Members consent in writing, within 90 days after the occurrence of the event described in Section 11.1(b), to continue the business of the Company. If a majority in interest of the remaining Members do not consent to continue the Company, the right of the Members to continue the business of the Company shall expire, the Manager shall file a statement of intent to dissolve, and the Company's affairs shall be wound up as provided in Article 12.

## ARTICLE 12

## DISSOLUTION AND TERMINATION

Section 12.1 <u>Final Accounting</u>. In the event of the dissolution of the Company, a proper accounting shall be made as provided in Section 9.4 from the date of the last previous accounting to the date of dissolution.

Section 12.2 <u>Liquidation</u>. Upon the dissolution of the Company, the Manager shall act as liquidator to wind up the Company. The liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All proceeds from liquidation shall be distributed in the following order of priority: (i) to the payment of debts and liabilities of the Company and the expenses of liquidation; (ii) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liabilities of the Company; and (iii) to the Members in accordance with Article 4.

Section 12.3 <u>Distribution in Kind</u>. If the liquidator shall determine that a Company asset should be distributed in kind, the liquidator shall obtain an independent appraisal of the fair market value of the asset as of a date reasonably close to the date of liquidation. Any unrealized appreciation or depreciation with respect to such asset shall be allocated among the Members (in accordance with the provisions of Article 5, assuming that the asset was sold for the appraised value) and taken into consideration in determining the balance in the Members' capital accounts as of the date of liquidation. Distribution of any such asset in kind to a Member shall be considered a distribution of an amount equal to the asset's fair market value for purposes of Section 12.2. The liquidator, in his sole and absolute discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.4 <u>Waiver of Right to Court Decree of Dissolution</u>. The Members agree that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each of the Members accepts the provisions of this Agreement as its sole entitlement on termination of its membership in the Company. Each Member hereby waives and renounces its right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company.

Section 12.5 <u>Articles of Dissolution</u>. Upon the completion of the distribution of Company assets as provided in this Article 12, the Company shall be terminated and the person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

## NOTICES

Section 13.1 <u>Method of Notices</u>. All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective upon receipt or, if mailed, upon the earlier of (i) the date set forth on the return receipt of registered or certified mail or (ii) the fifth day after mailing.

Section 13.2 <u>Computation of Time</u>. In computing any period of time under this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday, or legal holiday.

## ARTICLE 14

## INVESTMENT REPRESENTATIONS

Section 14.1 <u>Investment Purpose</u>. In acquiring an interest in the Company, each Member represents and warrants that it is acquiring such interest for his own account for investment and not with a view to sale or distribution. Each Member recognizes that investments such as those contemplated by the Company are speculative and involve substantial risk. Each Member further represents and warrants that the Manager has not made any guaranty or representation upon which he has relied concerning the possibility or probability of profit or loss as a result of his acquisition of an interest in the Company.

Section 14.2 <u>Investment Restriction</u>. Each Member recognizes that: (i) the membership interests have not been registered under the Securities Act of 1933, as amended, in reliance upon an exemption from such registration, (ii) a Member may not sell, offer for sale, transfer, pledge, or hypothecate all or any part of its interest in the Company in the absence of an effective registration statement covering such interest under the Securities Act unless such sale, offer of sale, transfer, pledge, or hypothecation is exempt from registration under the Securities Act of 1933, as amended, (iii) the Manager has no obligation to register any Member's interest for sale, or to assist in establishing an exemption from registration for any proposed sale, and (iv) the restrictions on transfer may severely affect the liquidity of a Member's investment.

# ARTICLE 15

## ADDITIONAL COVENANTS

Subject to the Manager's instructions and discretion, Paxton covenants and agrees to provide to the Company, for no additional consideration, the development services set forth in Exhibit A (the "Services") for each Project of the Company.

# ARTICLE 16

## BUSINESS OPPORTUNITIES

Except as otherwise specifically set forth herein, any Member or Manager, or any officer, director, employee, shareholder or other Person holding a legal or beneficial interest in any Member or Manager which is a member or manager of the Company, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including such business ventures as may be in direct competition with the Company's business, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived therefrom.

# ARTICLE 17

## GENERAL PROVISIONS

Section 17.1 Entire Agreement. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings, or agreements in regard thereto.

Section 17.2 Amendment. This Agreement may not be amended without the unanimous written consent of all Members. No rights under this Agreement may be waived except by an instrument in writing signed by the party sought to be charged with such waiver.

Section 17.3 Applicable Law. This Agreement shall be construed in accordance with and governed by the laws of the District of Columbia.

Section 17.4 Waiver of Jury Trial. The Members agree that, in the event of a dispute, the Members hereby waive their right to a jury trial.

Section 17.5 Pronouns. References to a Member or a Manager, including by use of a pronoun, shall be deemed to include the masculine or feminine gender, singular or plural, and individuals, trusts, partnerships, corporations, or other legal entities where applicable.

Section 17.6 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

**IN WITNESS WHEREOF**, the Members have executed this Agreement to be effective as of the date first set forth above.

Daniel Huertas
Digitally signed by Daniel Huertas
DN: cn=Daniel Huertas, o=DP Capital, LLC, ou, email=daniel@wcp.team, c=US
Date: 2020.04.09 11:45:08 -04'00'

_____
Daniel Huertas

_____
Charles Paxton Paret

EXHIBIT A

1. **Design Phase Services.** Paxton shall assist the Company in determining the Company's program requirements for each Project to be constructed.

    a. Paxton shall arrange and conduct meetings with all design consultants jointly deemed essential by the parties and coordinate the requirements of the Project and design development.

    b. Paxton, in conjunction with the Project team, shall advise the Company on site use and improvements, selection of materials, building systems and equipment, and provide recommendations to the Company on relative construction feasibilities, applicability of materials and labor, time requirements for installation and construction, and factors relating to costs, including comparative costs of alternate designs or materials, preliminary budgets and possible economies. Paxton shall review with the Company, the Manager, the architect and the contractor, as applicable, the cost of various design and construction alternatives.

    c. Paxton shall review and advise the Company with respect to draft plans and specifications prepared by the architect and recommend alternatives whenever it is apparent that design details affect construction feasibility or schedules, or may be improved for cost reductions and shall advise the Company when Paxton has knowledge of non-compliance of the same with applicable codes, laws, regulations, or ordinances or with industry standards.

    d. Paxton shall review drawings and specifications that are being prepared to ensure that the Company's requirements are incorporated and shall advise the Company when the design details may affect the budget or Project schedule.

2. **Preconstruction Phase Services.** Paxton, the architect and the contractor shall coordinate, meet and assist with the appropriate governmental authority to ensure required permits are obtained at the appropriate times. Paxton or the Manager or Manager's representative shall represent the Company at all meetings and hearings necessary to obtain all required permits.

    a. To the extent not previously provided by the Company and deemed necessary by the Manager, Paxton shall arrange for applicable tests, surveys and/or inspections including, but not limited to, geotechnical, environmental, warranted by site conditions and appropriate due diligence requirements. The Company shall approve in writing in advance all testing companies.

    b. Paxton shall review lists of prospective subcontractors provided by the contractor and assist in the review of bids. Paxton shall obtain information from the contractor to identify the financial condition and project experience of the proposed subcontractors to perform the work and make recommendations to the Company as to the preferred subcontractors based on price and qualifications.

   3. **Construction Phase Services.** Subject to requirements of lender and review by the Manager, Paxton shall develop and implement procedures for the review and processing of applications by the contractor and subcontractors for progress and final payments. Paxton, after consulting with the Manager, shall make recommendations to the architect for certification of the contractor payment applications.

    a. Paxton, with input from the Manager, shall oversee the efforts of the subcontractors in maintaining the budget and cost accounting of the Project suitable to the Company's needs. Paxton shall review cost detail reports to assist in the proper allocation of invoices and payment applications to the proper budget categories.

    b. Paxton, with input from the Manager, shall facilitate the resolution of any questions or requests for interpretation that may arise in connection with the plans and specifications.

    c. Paxton, with input from the Manager, shall develop and implement procedures for review and processing of change orders.

    d. Paxton, with input from the Manager, shall oversee the efforts of the subcontractors who shall establish and implement adequate procedures for processing, approval and filing of shop drawings, product data, samples and other submittals.

    e. Paxton, with input from the Manager, shall maintain appropriate record copies of all subcontracts, drawings, plans and specifications, shop drawings, and approved addenda, change orders and other modifications in good order. Paxton shall monitor the efforts of the contractor who shall mark up drawings and specifications to reflect as-built changes as they occur. Such plans shall be turned over to the Company upon completion of the Project.

    f. Paxton, with input from the Manager, shall monitor the subcontractor's suppliers.

    g. Paxton shall coordinate with the Manager the inspections by the Architect.

    h. Paxton shall coordinate the efforts of the Manager, the Company, the architect, and the contractor in punchlist compilation. Paxton, with input from the Manager, shall monitor the efforts of the contractor in final completion of the punchlist items. Paxton shall assist the Manager and the Company in final inspection.

    i. Paxton shall secure from the subcontractors all warranties and guaranties, manuals, record drawings, submittals and as-built plans, and keys upon final completion for turnover to the Company.